Hazel D. WOODARD and Robert T. Mills, Appellants,

v.

John E. LEHMAN, Jr., Secretary of the Navy, Appellee.

No. 82–1224.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 10, 1983.

Decided Sept. 15, 1983.

John J. McGrath, Jr., Washington, D.C. (John P. Dean, Donovan Leisure Newton & Irvine, Washington, D.C., Ray P. McClain, Charleston, S.C., William L. Robinson, Washington, D.C., Stephen L. Spitz, Columbia, S.C., Lawyers' Committee for Civil Rights Under Law on brief), for appellants.

Alex H. Adkins, Dept. of the Navy, Washington, D.C. (Henry Dargan McMaster, U.S. Atty., Heidi M. Solomon, Asst. U.S. Atty., Charleston, S.C., on brief), for appellee.

Before RUSSELL and ERVIN, Circuit Judges, and FIELD, Senior Circuit Judge.

DONALD RUSSELL, Circuit Judge:

This is a Title VII disparate treatment action instituted by the plaintiffs to redress alleged racial discrimination suffered by them as employees at the Southern Division of the Naval Facilities Engineering Command at Charleston (S.C.) Navy Yard (hereinafter referred to as SOUTHDIV), in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* As initially filed, they sought both individual and class relief. Though begun in 1976, class certification was apparently not resolved finally until 1980. The request for class certification was denied at that time and the plaintiffs have not appealed that denial. The only issues in the case, therefore, are the individual discriminatory treatment claims of the two plaintiffs.[1] As presented in this appeal, the alleged disparate treatment in each was the failure of the Navy to promote. The District Court, after a trial, found no merit in the claim of either plaintiff on the basis of extensive findings of fact and conclusions of law.[2] The plaintiffs have appealed that decision. We affirm.

This proceeding began with the filing by the two plaintiffs of substantially identical administrative claims of disparate treatment with the appropriate officer of their employing federal agency on March 4, 1976. The plaintiff Mills alleged "continuing discrimination against him on the grounds of race" beginning with his employment in 1955 and continuing until the date of his claim, and the plaintiff Woodard, beginning with her employment in 1964 and continuing until the date of her claim. As a result of such alleged discrimination the plaintiff Woodard asserts in her charge that she "had not been able to advance past the position of Accounts Maintenance Clerk, GS–4" and the plaintiff Mills claimed in his

---

1. The District Court, in its opinion, refers at one point to disparate impact; however, the plaintiffs in their brief, correctly describe their action at all times as one based on a claim of disparate treatment. *See Pope v. City of Hickory, N.C.,* 679 F.2d 20, 22 (4th Cir.1982); *Stastny v. Southern Bell Tel. & Tel. Co.,* 628 F.2d 267, 274, n. 10 (4th Cir.1980); and Furnish, *A Path Through the Maze: Disparate Impact and Disparate Treatment Under Title VII of the Civil Rights Act of 1964 After Beazer and Burdine,* 23 B.C.L.Rev. 419 (1982).

2. *Woodard v. Lehman,* 530 F.Supp. 139 (D.S.C. 1982).

charge denial of promotion beyond "the position of Supply Clerk, GS–4." Using exactly the same language both plaintiffs assigned in their separate charges as "the principal reason for [their] inability to advance" (1) "the subjective criteria for determining advancement, especially the 'merit promotion performance appraisal'" and (2) the denial of "opportunities for training and doing certain types of work which are said to be prerequisites for advancement."

After a review of these charges and the report of the EEO counselor in connection therewith, the Commanding Officer "requested the plaintiffs to provide written statements with specific illustrations of the alleged discrimination and a specific statement of the corrective action required." This request followed the procedure set forth in Federal Personnel Manual Letter 713–21, dated September 21, 1973, as quoted in *Johnson v. Bergland,* 614 F.2d 415, 417, n. 2 (5th Cir.1980). The plaintiffs, according to the findings of the District Judge "responded that the complaints presented to the EEO counselor were sufficient as the charge was one of systematic and continuing discrimination." Following this refusal by the plaintiffs to amplify their charges by giving specific instances or dates, the Commanding Officer cancelled the charges for a failure to prosecute for failure to comply with this request for specification. The letter of cancellation, which was dated May 9, 1976, advised the plaintiffs of their right of appeal to the Civil Service Commission or to file an action for judicial review in the appropriate federal District Court.

The plaintiffs, electing to file their complaint for judicial relief, thereupon began this action, on June 17, 1976, alleging racial discrimination in failure to promote for the same reasons as detailed in their administrative charges. In answering the complaint of the plaintiffs, the defendant plead as his first defense that "[p]laintiffs [had] failed to exhaust administrative remedies prerequisite to the filing of suit by a federal employee under § 717(c) of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e–16(c)." [3] The defendant, also, denied any discrimination. After this joinder of issues, the defendant moved formally to dismiss the action for failure of the plaintiffs "to exhaust their administrative remedies by refusing to provide specific details as to their charges of discrimination, after having been requested to do so by a Navy official. That motion was denied, the District Court stating:

"The record shows however, that this is not a case in which a charging party refused to cooperate with a reasonable investigative request; here, counsel for the plaintiffs promptly stated in response to the request that both he and the plaintiffs were willing to meet with Navy officials to provide additional details. The Navy's decision to cancel the charges of discrimination despite plaintiffs' willingness to cooperate in the investigation cannot properly be blamed on the plaintiffs, and furnishes no basis for a dismissal of this case."

After the motion to dismiss was denied, the parties proceeded to discovery and to trial on the merits. At the completion of the trial, the District Court filed its findings of fact and conclusions of law. In its findings on plaintiff Woodard's claim it found first that "[a]t the time Woodard complained about discrimination at SOUTHDIV in 1976, however, the only positions [that had been] filled were reassignments or lateral transfers from other Navy activities [in accordance with established Navy employment policy]. The defendant did not 'promote' any of the applicants." On the basis of this finding, the District Court concluded that Woodard had "not made a prima facie showing of discrimination" at the time of her complaint under the *McDonnell-Douglas* standard since there was no vacancy for a promotion for which the plaintiff was qualified and which was

---

**3.** The exclusive statutory remedy for discrimination against federal employees is under § 717(c), § 2000e–16, 42 U.S.C., compliance with which is obligatory on a complainant.

*Brown v. GSA,* 425 U.S. 820, 829–32, 96 S.Ct. 1961, 1966–68, 48 L.Ed.2d 402 (1976); *Siegel v. Kreps,* 654 F.2d 773, 777 (D.C.Cir.1981).

given a white employee during the time covered by her charge.[4] But "[a]ssuming arguendo that Hazel Woodard [had] made out a prima facie claim" and that there was a position from 1964 on to which she could have been promoted the District Court went on to find that "the defendant [had] articulated a legitimate, nondiscriminatory reason for her rejection" for promotion. It detailed the facts offered in support of this reason as presented by the defendant and then concluded, after reviewing plaintiff Woodard's proof in response, that the latter had "not been able to demonstrate that reasons articulated by the defendant for her rejection [were] pretextual."[5] It accordingly dismissed Woodard's claim of racial disparate treatment. So far as the other plaintiff was concerned, the District Court found that the defendant "had no vacancies for positions desired by Robert Mills" within the relevant time period and further that during this period, "he was offered training in another field with excellent potential for advancement, but he declined the offer." Another black was selected for the training that Mills had refused and was subsequently promoted by the defendant to the GS–8 level. It found under these facts that Robert Mills had not made "a prima facie showing of discrimination." The District Court accordingly dismissed both claims. These are the findings which the plaintiffs on this appeal challenge. Such findings may only be reversed if clearly erroneous.

Before discussing the District Court's findings on the substantive merits of the plaintiffs' claims, it is necessary to consider the propriety of the denial of the defendant's threshold motion to dismiss for failure of the plaintiffs to exhaust administrative remedies. In their administrative charges, as we have already observed, the plaintiffs did not give any specifications of a discriminatory action taken against them by the defendant on a date "within 30 calendar days" of their charges. The federal regulations under § 2000e–16, 42 U.S.C. (the plaintiffs' exclusive remedy, *see Brown v. GSA, supra,* 425 U.S. at 829–32, 96 S.Ct. at 1966–68), expressly provide that a federal agency need consider a discrimination charge or complaint *only* if "the complainant brought to the attention of the Equal Employment Opportunity Counselor the matter causing him to believe he had been discriminated against *within 30 calendar days* . . . ." 29 C.F.R. 1613.214(a)(1) (Italics added). The validity of this regulation is well settled. *See Ettinger v. Johnson,* 518 F.2d 648, 652 (3d Cir.1975). *See also, Kizas v. Webster,* 707 F.2d 524, 544–46 (D.C.Cir. 1983). Moreover, the plaintiffs and their counsel appear to have been cognizant of this requirement and of its applicability. Thus, the plaintiff Woodard, in her charge which was obviously prepared by her counsel, purported to comply with this requirement alleging that "[t]he most recent act of discrimination, which has occurred *within the past 30 days,* is the refusal to afford me opportunities for training [which could lead to advancement] which were given to white persons in my department."[6] (Italics added) When pressed for details of any act of discrimination within 30 days of the filing of their complaints, both Ms. Woodard and Mills refused, each declaring categorically in response to an interrogatory requesting such details that: "My individual claim of

---

**4.** *McDonnell-Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

**5.** In making its findings and in reaching its conclusions, the District Court dismissed the statistical evidence offered by the plaintiffs as irrelevant. It held that such evidence represented merely a comparison of "the general racial composition of the SOUTHDIV work force with the general population in the Charleston area" and made at most "only a token effort, however, to compare specific job categories in the SOUTHDIV work force with the qualified labor market." Such statistical evidence might have been important in resolving a claim of discrimination in hiring, but it plainly was not pertinent to charges of individual acts of discrimination against employees already employed. *See Hill v. Western Electric Co., Inc.,* 596 F.2d 99 (4th Cir.1979), *cert. denied,* 444 U.S. 929, 100 S.Ct. 271, 62 L.Ed.2d 186; *Pace v. Southern Ry. System,* 701 F.2d 1383 at 1389 (11th Cir.1983).

**6.** Mills' charge omitted entirely any such claim.

racial discrimination is not based strictly on any single incident or set of incidents, but is rather based on the continuing discrimination against me [in Woodard's case] from 1964 to present" and [in Mills' case] "from 1955 to the present." When the plaintiffs refused to supply any specific information or details of discriminatory action suffered by them within 30 days of their charges, the defendant cancelled the charges. By so refusing to give such details and dates the plaintiffs prevented the defendant from investigating the charges and consequently failed to exhaust administrative remedies, a jurisdictional prerequisite to the maintenance of a judicial action.

■ The District Court denied the defendant's motion to dismiss for failure of the plaintiffs to cooperate in the administrative proceedings because as it said, the plaintiffs and their attorney "were willing to meet with the Navy officials to provide additional details." The District Court was, however, manifestly incorrect in the reasons it gave for denying the motion. It may be that plaintiffs and their counsel were "willing" to give "additional details" about their claims but this willingness did not extend to supplying details or dates of discriminatory action or actions against them on the part of the defendant within 30 days of the date of their charges, and this was the critical point in issue which the defendant sought to identify.[7] Nowhere in the record is there any evidence that the plaintiffs were even willing—or, for that matter, were ever in a position to be able—to identify some act of discrimination within the critical 30 day period before the filing of their charges. The plaintiffs' answers to the interrogatories, quoted *supra*, are unequivocally to the effect that the plaintiffs were unwilling to attempt such identification. And, even at trial on the merits, the plaintiffs did not identify any act of discrimination experienced by either of them within 30 days of their administrative complaints; to the contrary, their evi-

dence established affirmatively that no discrete act of discrimination occurred in this 30-day period.[8] In effect, the plaintiffs' claim was, as plainly set forth in their answer to an interrogatory seeking details, one of continuing discrimination from 1955 onward without any supporting identification of a single, discrete act of overt discrimination within 30 days of their administrative charges.

■ The plaintiffs and their counsel obviously were proceeding on the theory that a claim of continuing discrimination, evidenced by a failure to promote them or train them for promotion at any prior time, irrespective of whether it was within 30 days of the charges, represented a compliance with the time requirements of § 713.-214(a)(1). Assuming for the moment that a failure to promote a specific employee, whether on a single or a number of occasions spaced over a long period of years, might be considered a continuing practice, *Cf., Goff v. Continental Oil Co.,* 678 F.2d 593, 597 (5th Cir.1982); *Ste. Marie v. Eastern R. Assn.,* 650 F.2d 395, 405–06 (2d Cir. 1981), that theory as an excuse for compliance with the time requirement of § 713.-214(a)(1) falls before the ruling of the Supreme Court in *Chardon v. Fernandez,* 454 U.S. 6, 102 S.Ct. 28, 70 L.Ed.2d 6 (1981); *Delaware State College v. Ricks,* 449 U.S. 250, 257, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980) and *United Air Lines, Inc. v. Evans,* 431 U.S. 553, 558, 97 S.Ct. 1885, 1889, 52 L.Ed.2d 571 (1977), and of this Court in *McCausland v. Mason County Bd. of Ed.,* 649 F.2d 278, 279 (4th Cir.1981), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639, and *EEOC v. Federal Reserve Bank,* 698 F.2d 633 (4th Cir.1983). In *Evans,* the Supreme Court said that "the critical question [in a case such as this] is whether any present *violation* [within the requisite time period] exists," and not

---

7. The motion to dismiss was heard by a visiting District Judge and not by the resident District Judge who ultimately decided the case.

8. The nearest date given by the plaintiff Woodard herself was one in 1977. *See* page 918, *infra.*

"mere continuity" of employment.[9] It is *only* where an actual violation has occurred within that requisite time period that under any possible circumstances the theory of continuing violation is sustainable.[10] *Evans* puts it very directly:

"A discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed. It may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue, but separately considered, it is merely an unfortunate event in history which has no present legal consequences." [11]

As one commentator has construed this language of the Supreme Court, it means "that discriminatory acts may be considered 'lawful' when no charge is filed within the applicable time period after the act." Carty, *The Continuing Violation Theory of Title VII After United Air Lines, Inc. v. Evans*, 31 Hastings L.J. 929 at 950 (1980), citing 431 U.S. at 558, 97 S.Ct. at 1889 ("But United was entitled to treat that past act as lawful after respondent failed to file a charge of discrimination within the 90 days then allowed by § 706(d)."). It follows that under *Evans* and the valid Regulations the defendant was unquestionably entitled to require the plaintiffs to provide specification of a violation of the Act within 30 days of their charges. This, as the Court said in *Evans* was the "critical question" and it is the one with respect to which the defendant had a right to demand specifications of the plaintiffs. When the plaintiffs refused to provide such information and thereby frustrated administrative review of the merits of their claims, the District Court should not have reached the merits of their claims "but should have granted the defendant's motion to dismiss for failure to exhaust administrative remedies," without proceeding to a trial on the merits. *Johnson v. Bergland, supra,* 614 F.2d 415.

In *Johnson,* the plaintiff, a federal employee like the plaintiffs here, filed a charge of continuing racial discrimination resulting in his failure to be promoted by his employing agency. After receipt of the charge, the Equal Employment Opportunity Counselor of the Agency requested the plaintiff to give specific details and dates

---

**9.** Emphasis in text.

**10.** In *McKenzie v. Sawyer,* 684 F.2d 62, 72 (D.C.Cir.1982), the Court said:

"Plaintiffs may not utilize the continuing violation theory to resurrect claims about discrimination concluded in the past, even though its effects persist."

Of course, this is not to say that evidence of an earlier act of discrimination, not timely filed "may [not] constitute relevant background evidence in a proceeding in which the status of a current practice is at issue." *Evans,* 431 U.S. at 558 [97 S.Ct. at 1889].

**11.** This language is quoted in part in the recent opinion of the Supreme Court in *American Tobacco Co. v. Patterson,* 456 U.S. 63, at 75, 102 S.Ct. 1534, at 1540, 71 L.Ed.2d 748 (1982) ... " '[a] discriminatory act which is not made the basis for a timely charge is the legal equivalent of a discriminatory act which occurred before the statute was passed,' ...."

In 31 Hastings L.J. at 948, the author states the ruling in *Evans* as follows:

"A plaintiff must prove that an act or practice occurring within the limitation period violated Title VII under either the disparate impact or disparate treatment theories of substantive liability."

Similarly, Jackson & Matheson, *The Continuing Violation Theory and the Concept of Jurisdiction in Title VII Suits,* 67 Geo.L.J. 811, at 851 (1979), summarized the law after *Evans* in these words:

"The title VII filing period serves an important function in the statutory scheme: it protects potential defendants from perpetual liability for alleged violations of the law. Courts should not succumb to the temptation to grant relief in hard cases through the invocation of questionable legal doctrines to circumvent the filing requirement. Thus, after *United Air Lines, Inc. v. Evans* the continuing violation theory may no longer be utilized when the plaintiff is unable to allege a present violation of the Act. Conclusory allegations that a violation continues should also no longer be sufficient. In addition, that a plaintiff suffers the effects of past discriminatory acts will not suffice to supply a viable cause of action. Nor can the existence of a *continuing employment relation, without more,* supply actionability to an otherwise stale claim. Employment relations frequently exceed six months; this theory, then, would virtually eliminate the limitations period for filing."

with respect to his complaint. He failed to supply such details and dates and the agency cancelled the claim. The plaintiff then filed his judicial action. On motion of defendant, the District Court dismissed for failure to exhaust administrative remedies and the Court of Appeals affirmed, adopting the reasoning of the District Court (614 F.2d at 418):

> "As a matter of law, I conclude that an agency can under 5 C.F.R. § 713.215 cancel a complaint for failure to prosecute on the ground that the complainant has failed, after due opportunity, to supply the agency with information sufficiently specific to enable it to conduct a meaningful investigation and to determine whether the complaint satisfies the other regulations. Further, I find that due opportunity was afforded to the plaintiff in the instant case and that the agency acted properly in determining, in its discretion, that insufficient information had been supplied to it. This is not an instance of 'continuing' discrimination. That concept requires sufficient allegation of a *present* violation." [12]

In line with the decision in *Johnson*, we repeat, a reversal of the District Court's refusal to grant defendant's motion to dismiss for failure to exhaust administratively was in order. This was especially appropriate since the plaintiffs admittedly were unable to specify any discriminatory action within 30 days of their charges. The plaintiff Woodard frankly conceded the nearest discriminatory action to March 4, 1976 (the date of her complaint) which she could identify was late 1977.[13] If the regulation set forth in 29 C.F.R. 1613.214(a)(1) requiring complaint within 30 days is to mean anything and if the principle stated in *Evans* that discriminatory acts not complained of "within the applicable time period" are to be "considered 'lawful'," this proceeding should have been terminated at the outset. However, after the District Court denied the motion to dismiss, the parties proceeded to trial and the cause was ultimately re-

solved by the District Court on the merits. We proceed accordingly to review the decision of the District Court on the merits of the plaintiffs' substantive claims, as developed at trial. *Cf., United States Postal Service, Bd. of Govs. v. Aikens,* —— U.S. ——, ——, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983).

As we have already indicated, the substantive claim of the plaintiffs is discriminatory failure to promote. In the case of Mills, the plaintiff would assert a claim going back to 1955, long before the statute granting rights to federal employees to seek relief for discrimination became effective, and continuing until trial in September, 1980, and, in the case of Woodard, back to 1964, when she was hired, and continuing until September, 1980. Both in their administrative charges ascribed their failure to achieve promotion during all these years to racially discriminatory treatment in connection with training necessary to qualify for promotion and to the use of subjective "merit promotion performance appraisal" in determining qualifications for promotion. After a trial, in which both the plaintiffs and the defendant offered considerable evidence, the District Court dismissed the claims on the merits. A review of the dismissal of such claims of the District Court requires an analysis of the evidence relating to the two claims. While the two plaintiffs have joined their claims in this action, the facts behind the claim of each, as discussed by the District Court in its findings, are different. It is accordingly necessary to discuss the facts supporting each individual claim separately. We begin with the claim of Ms. Woodard.

At the outset it must be emphasized again that Woodard neither applied for nor sought promotion to any vacancy within 30 days of the filing of her administrative charge of discrimination. The only two instances of such an application by Woodard prior to the filing of her administrative charge on March 4, 1976, were, by her testi-

---

**12.** Emphasis in text.

**13.** See *infra* p. 918.

mony at trial, in 1973 and 1974.[14] As her first alleged act of discrimination on which she grounds her action, the plaintiff Woodard referred to an application by her on July 30, 1973, for promotion to the position of Accounts Maintenance Clerk, GS–6.[15] She did not, however, complain at the time of the denial of her application for the promotion. At trial, she gave two reasons for such failure to file such a complaint. Her first reason was explicit enough: "I didn't think it was discrimination." She did add in further explication of this statement: "I suspected, but I didn't believe it was discrimination. It didn't actually come to my mind it was discrimination until I filed the Complaint, and that was about the latter part of '76." The second reason given by her was that her request for promotion was to grade GS–6 and apparently the vacancy for which she applied carried only a GS–5 rating. The plaintiff herself testified that, if your application is for a GS–6 rating, you will be considered for a GS–5 rated vacancy only if in your application you stated you wanted to be considered for a lower rating. Woodard did not so indicate on her application that she wanted to be considered for the vacancy if it carried but a GS–5 rating. It followed that, under this rule, her application would not have been considered. Accordingly, Ms. Woodard gave two reasons, either of which was sufficient to rebut any possible claim of discrimination in the denial of a promotion to GS–5 on this occasion.

The other allegedly discriminatory incident prior to March 4, 1976, was in July, 1974. At that time she sought promotion to a position as an Accounting Technician, GS–5 or Voucher Examiner GS–5. During the time period this application was effective [until July 23, 1975], the District Court found there were but two vacancies in these classifications and these vacancies were filled without a promotion, by a lateral transfer or reassignment of an employee already serving at the same grade level as the vacancy. Such reassignment or lateral transfers conformed to the established employment policy of the defendant and were not treated as a promotion.

The plaintiff Woodard *in her brief but not in her testimony at trial,* does refer to another promotion in 1974 for which she alleged she was qualified but which was given to a white woman in her unit. This, however, was a promotion from GS–5 to GS–6. Ms. Woodard had not applied for a promotion from GS–5 to GS–6 at this time, nor is it likely she could have been found qualified. In any event, this promotion was not regarded by Ms. Woodard as discriminatory, for she herself does not refer to it as such in her testimony and it only arises in her brief in this Court; moreover, it occurred some year and a half before Ms. Woodard filed an administrative charge. In fact, Ms. Woodard, after describing her applications in 1973 and 1974, was asked: "[W]hat was the nearest point in time

14. Ms. Woodard testified that prior to 1973, employees in her unit had been promoted to GS–5 in other sections. She frankly admitted, however, that "the reason they were given [these promotions] ... was the fact that they had more experience [than she], and they had accounting experience which they received in the other room." Naturally, she had made no claim of discrimination in connection with these promotions, since she implicitly admitted no discrimination against her in these promotions.

15. *She referred in support of this application to* a "qualified" rating given her by the clerical staff in the Consolidated Civilian Personnel Office (CCPO) at the Naval Supply Center in Charleston. Such a rating is prepared by CCPO on the basis of a Personal Qualifications Statement (SF–171) prepared and submitted by the appellant herself. That statement is examined according to the District Court's findings [which on this aspect of the case are undisputed]: "to determine whether the applicant satisfied basic requirements for the vacant position on the register .... After basic requirements have been examined, applications receive a numerical rating that indicates how well their previous employment history relates to qualifications for the vacant job on the register." This rating, however, is only one part of the selection process. The appellant's supervisor is requested to give his appraisal of the applicant. This evaluation of the applicant's supervisor and the CCPO rating are considered in making the selection among applicants for a vacancy. Following such procedure, Woodard was not selected in 1973 for the vacancy.

where a promotion action was taken you know [of] that relates to your 1976 Complaint?" The answer was a promotion of Debra Brown which occurred "in 1977." [16]

Although Ms. Woodard had proved no act of discrimination within the time period of within 30 days of her administrative charge, the District Court permitted her to attempt to prove discrimination in promotion after the filing of her charge.[17] However, the District Court painstakingly reviewed every vacancy filled during this period and found that the evidence refuted any claim of discrimination in connection with any vacancy arising during this period. In a number of instances, the vacancy was filled by lateral transfer or reassignment consonant with the defendant's employment practices, to which we have already referred. More important the District Court found as a fact (1) that Ms. Woodard "was not promoted because of problems in the performance of her GS-4 level duties, "in essence that she failed to establish qualifications for promotion, and (2) that "in [all] subsequent promotions sought by plaintiff Woodard, selections were made on the basis of individual ability to perform rather than on the basis of her race."

■ There is ample evidence in the record—much of it given by Ms. Woodard herself—establishing "problems in the performance of her GS-4 level duties," problems which explained the reason for this plaintiff's failure to receive promotions from early 1976 on, as found by the District Judge and which, if accepted by the trier of facts established her lack of qualifications for promotions.[18] Under the evidence, Ms.

Woodard was initially employed as a typist. In this capacity, she seems to have performed satisfactorily and received fairly promptly a promotion from GS-3 to GS-4. The evidence shows that whenever Ms. Woodard could demonstrate proficiency in the performance of her duties, she was given prompt consideration for promotion. But, as the defendant began to innovate with automated methods of operation in Ms. Woodard's unit from the late '60's and early 1970 on, and to change the duties performed by employees in Woodard's unit, including Ms. Woodard, it is quite obvious from the record that Ms. Woodard was unable to adjust to her new duties, to learn to perform proficiently the new duties assigned to her in connection with the changes made in the functioning of the unit, or to qualify for promotion.

This was not a finding for which the District Court had to rely on the testimony of Ms. Woodard's supervisors; it was a finding abundantly established by Ms. Woodard's own testimony about her job performance from the 1970's forward. Thus, in the latter '60's she was assigned as a part of her new duties to the operation of a Flexo-Writer. A number of other employees who similarly were assigned to this work along with her were promoted in the next few years. The plaintiff concedes these promotions were not discriminatory; she makes no complaint about them. She does not contest the superior qualifications of these employees who were promoted over her, explaining they "had more experience and they had accounting experience." Implicit in this testimony was an admission

---

16. It is odd that Ms. Woodard would suggest that Debra Brown's promotion was discriminatory, since she testified that Brown "was more highly qualified than I was."

17. Whether it is proper to consider claims arising long after the charge, see *Patterson v. General Motors Corp.,* 631 F.2d 476, at 483 (7th Cir.), *cert. denied,* 451 U.S. 914, 101 S.Ct. 1988, 68 L.Ed.2d 304 (1981).

18. As the Court said in *Griggs v. Duke Power Co.,* 401 U.S. 424, 430–31, 91 S.Ct. 849, 853–54, 28 L.Ed.2d 158 (1971) and repeated in *McDonnell-Douglas Corp. v. Green,* 411 U.S. at 800–

01, 93 S.Ct. at 1823–24, "Congress did not intend by Title VII, however, to guarantee a job [or a promotion] to every person regardless of qualifications. In short, the Act does not command that any person be hired [or promoted] simply because he was formerly the subject of discrimination, or because he is a member of a minority group." Even in establishing a prima facie case, a plaintiff must make a showing that she was "qualified for a job [or promotion]" and, upon the merits, this burden of establishing qualifications rests on the plaintiff. *See* 411 U.S. at 802, 93 S.Ct. at 1824.

that those promoted performed better and were better qualified than Ms. Woodard. Beyond that, Ms. Woodard recognized her own shortcomings in this work. Later, Ms. Woodard was given the assignment of operating a keypunch machine as a part of her duties. She described the machine as "just the keyboard." Moreover, she had taken a special course at a local business school on the operation of such a machine. Nonetheless, she testified she never became "proficient at it, to get good at it." Later, when given the task of using the voucher machine in the rearrangement of her duties, and even though she was, by her own admission, given training in its operation by her supervisor and by a fellow worker, again, she never developed any proficiency in its operation, her supervisor testifying without any real contradiction that, in her operation of the machine, she repeatedly fell behind with her work and had to be helped by others. In fact, one of her supervisors (Ms. Baker) testified (without contradiction by Ms. Woodard) that she was very slow both as a learner and in her work, often taking two or three days to do what other workers could do in half-a-day. When a Wang word-processor was introduced as a part of the unit's essential operation, Ms. Woodard was given extensive training in its operations-actually, according to Ms. Lilienthal's undisputed testimony, considerably more than any other employee. Yet Ms. Woodard does not even contend she could operate the word-processor. She did complain about failure to assign her to accounting duties. She, however, overlooks the fact that the Navy made every effort to give her a chance to qualify for such an assignment. Thus, the Navy twice paid for her accounting courses at local educational institutions (College of Charleston and Baptist College). In one of the courses, she

dropped out; the other she failed, receiving an "F" grade.[19]

She admitted generally that, as the operations in the unit changed she had considerable difficulty in performing her new duties and was continuously asking for information and assistance which, in her words, appeared "silly" to the other employees. It is obvious that the failure to promote Woodard was not favoritism or racial prejudice; she was simply unable to adapt to the innovations being installed in the unit and to show such proficiency in the performance of her duties as to qualify for promotion. The findings of the District Court to this effect are not clearly erroneous.

■ In what must be considered an indirect but revealing way of admitting her want of qualifications for promotion, Ms. Woodard would excuse her failure to qualify on the denial to her of the training given other employees in the unit when new duties were assigned them. She does not, however, identify any occasion when she requested and was denied such training within 30 days of March 4, 1976, or for that matter, at any specific time. Certainly, she needed no training in typing, which was largely her duties for the first few years of her employment. She never attempted to compare the training available to her, as compared with that made available to other employees. Moreover, there was ample evidence that she was given training or offered the opportunity for training, whenever a need for such training appeared required. This claim of denial of training appears to have been little more than an attempt on her part to excuse her poor performance record rather than a serious complaint of discrimination. When, for instance, she was assigned in 1967 to work on a Flexo-Writer machine, her duties continued to be substantially typing for which she

---

**19.** In its findings, the District Court referred to an application for promotion submitted by the plaintiff Woodard to another unit at the Shipyard not connected with SOUTHDIV, where she was given an interview by the review board, on which the EEOC counselor, a black, sat. · This board unanimously rejected the plaintiff, giving her the lowest grade of those

on the list of applicants. The District Court's finding on this is:

"Other officials responsible for promotions at government activities not connected with SOUTHDIV have rejected plaintiff on the basis of her inability to answer basic questions about government accounting."

needed no training. Subsequently, the operation of a keypunch machine was assigned to her as a part of her duties. This machine was easy to operate and in addition, Ms. Woodard testified she had taken a course in operating such a machine at a local business school and had been given training on the job in the use of the machine by her supervisor. Presumably she needed no additional training for this work. When Ms. Woodard was later transferred to the Accounting Branch in 1970 and was assigned to the operation of the voucher machine, she admitted being given training by Dale Smith, another operator, and by Ms. Lilienthal, her supervisor. Subsequently, her duties were extended to loading data into the computer; she was provided training for this, though, as we have seen, she never mastered this work and constantly required assistance. She was given, according to the testimony of Ms. Lilienthal, fifteen hours of training on the use of the Wang word-processor, more than given any other employee. Moreover, she testified she was being constantly encouraged to take accounting and mechanical courses to qualify for a promotion.[20] She showed a reluctance to follow this advice, though, as we have earlier observed, she did enroll in two such courses at defendant's expense, in one of which she withdrew and in the other she received a failing grade. It is plain that a finding against the plaintiff on any claim that her lack of qualifications for promotion was due to a denial of training opportunities may not be set aside as clearly erroneous, and could not be a valid excuse for the plaintiff's lack of qualification for promotion.

All this evidence of lack of qualifications for promotion, the plaintiff argues should be disregarded because she, a black, was the only employee who had worked at the installation as long as she who had not been promoted out of GS–4. This argument is somewhat misleading and disingenuous. Ms. Woodard actually testified to four others, all white who had not at the time of trial in 1981 been promoted, even though they had all been long employed by the defendant.[21] Moreover, there was a white employee in her unit who had been denied for many years promotion beyond GS–3.[22] Actually, Ms. Woodard explained the failure of these four whites in her unit to be promoted because they found it difficult to adjust to the automation which had been installed in the unit by the defendant. The same reason appears to have been the cause for Ms. Woodard's failure to promote: She simply was unable to perform when more sophisticated operations were introduced and thus not qualified for promotion. She was not treated any differently than the four white employees in the unit.

Finally, the plaintiff points to her rating on the CCPO reports. This contention, however, disregards the character of these reports. As we have seen, these ratings were based on the applicant's own statement of her experience as compared with the experience required for the vacancy. This was in no way an evaluation of the applicant's competency, which was determined either by the reports of the appli-

---

**20.** Ms. Woodard's supervisor testified in this connection:

"On the advancement, we have given her training. She has put—applied for one training course outside of hours, the accounting course. We paid for that course for her. We agreed to pay for it for her. She did not pass that course. I recommended her for a bookkeeping—governmental bookkeeping course. She has gone to several training seminars there recently. She has gone to the governmental bookkeeping for a week. She has gone to 'Understanding Yourself and Your Supervisor,' I believe it was called. She went for a week for a speed reading, I believe it was called speed reading. There is a training program established, because the forms went out. She had the opportunity to select what training she wanted to be given, and that has been scheduled so far as the time available. And we have someone in the office, a Mr. Felts, that he is responsible for follow-up to be sure that the proper forms are submitted and she will be given training along with everybody else in the same manner."

**21.** These employees are all identified in Finding # 20 of the District Court.

**22.** See p. 263, Appendix.

cant's supervisors or a personal interview by a review board, or both. Ms. Woodard knew the purport of some if not all such reports by her supervisors. She referred in her examination to one by her supervisor, Ms. Toney. According to the plaintiff, this report characterized the plaintiff as an employee who "refuse[d] to do anything new," who "refuse[d] to learn new things" and didn't "punch cards fast enough." The plaintiff did not dispute these criticisms; rather she simply justified, as we have seen, her shortcomings in this regard because she hadn't had enough training on a keypunch machine. This record which we have detailed at some length does not show that she was qualified for promotion and does not support a conclusion that the findings of the District Court on the merits of her claim were clearly erroneous.

We turn now to the claim of the plaintiff Mills, who has worked at SOUTH-DIV since 1955. He was promoted to the GS–4 level in 1963 as a Supply Clerk. His applications for promotions to GS–5 were rejected in 1963, 1964 and 1967 and he filed an unsuccessful discrimination complaint on that account. He later applied again in 1974 but the position was never filled. All of these were without the scope of his complaint in this case; they are at best under the circumstances but "the legal equivalent of a discriminatory act which occurred before the statute was passed" and are "merely an unfortunate event in history which has no present legal consequences." *United Air Lines, Inc. v. Evans, supra,* 431 U.S. at 558, 97 S.Ct. at 1889. Since 1970 employment in his Branch has been progressively dropping. There specifically were no vacancies to be filled. Unlike the situation in connection with the plaintiff Woodard's qualifications for promotion, the defendant freely concedes Mills' competency. His supervisor testified that Mills "was capable of performing at the GS–5 level without additional training." The only problem, as the supervisor added, was that "there were no vacant positions in the Supply Branch." Mills' supervisor recognized this and encouraged Mills "to apply for upward mobility

jobs [outside his unit] that [would] lead to greater potential for advancement." Mills refused. Another employee—a black—took advantage of one of these opportunities first offered Mills and, as the District Court observes, that employee has now advanced to a GS–8 rating. In another instance, a subordinate of Mills took advantage of another opportunity available to Mills and has advanced from a GS–3 rating to a GS–5 rating. On such a record, the District Court found no discrimination and we perceive no error in such finding.

The findings of fact and conclusions of law of the District Court and its dismissal of the actions of the plaintiffs are accordingly

AFFIRMED.

ERVIN, Circuit Judge, concurring:

The court holds that Woodard and Mills failed to exhaust their administrative remedies before instituting the present action, with the consequence that the district court lacked jurisdiction over their claims. I agree: as in *Johnson v. Bergland,* 614 F.2d 415 (5th Cir.1980), the complainants failed to cooperate with the defendant agency's attempt to investigate their complaints, and by doing so shortcircuited the agency's attempt to correct any problem without the necessity of judicial intervention. This is not a case like *Mangiapane v. Adams,* 661 F.2d 1388 (D.C.Cir.1981), in which the agency simply dismissed a complaint for lack of specificity without requesting clarification from the complainant.

Having concluded that the district court lacked jurisdiction over this case, we have jurisdiction only to vacate the district court's judgment and remand the case for dismissal. "Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." *Ex parte McCardle,* 74 U.S. (7 Wall.) 506, 514, 19 L.Ed. 264 (1869). In such a situation, it is not appropriate, in my

opinion, to comment on the merits.[1] I disassociate myself, therefore, from the majority's extensive discussion of the substance of this case. In addition, I am less certain than my colleagues that the continuing violation theory of Title VII is no longer tenable, and decline to endorse the majority's dicta to that effect. *See Patterson v. American Tobacco Co.*, 634 F.2d 744, 751 (4th Cir.1980) (*en banc*), *vacated on other grounds*, 456 U.S. 63, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982).

1. The court's opinion cites *United States Postal Service Board of Governors v. Aikens,* —— U.S. ——, 103 S.Ct. 1478, 75 L.Ed.2d 403 (1983), in connection with its review of the merits. *Aikens* did not involve a district court judgment void for want of jurisdiction, but held that when a Title VII disparate treatment case has been fully tried on the merits, whether the plaintiff made out a prima facie case is irrelevant.