**NAACP LABOR COMMITTEE OF FRONT ROYAL, VIRGINIA, et al., Plaintiffs,**

v.

**LABORERS' INTERNATIONAL UNION OF NORTH AMERICA, et al., Defendants.**

Civ. A. No. 90–0073–H.

United States District Court, W.D. Virginia, Harrisonburg Division.

May 24, 1993.

Steven D. Rosenfield, Charlottesville, VA, Avis E. Buchanan, Joseph M. Sellers, Washington Lawyers' Committee for Civil Rights Under Law, Washington, DC, for plaintiffs.

William W. Sharp, Kates & Sharp, P.C., Front Royal, VA, Glenn M. Hodge, Wharton, Aldhizer & Weaver, Harrisonburg, VA, John McN. Broaddus, Victor J. Van Bourg, Laurence E. Gold, Connerton, Ray & Simon, Washington, DC, Joan L. Casale, Bowles Rice McDavid Graff & Love, Martinsburg, WV, Michael C. Warlow, Wright, Constable & Skeen, Baltimore, MD, Roger A. Ritchie, Roger A. Ritchie and Associate, Harrisonburg, VA, Stanley J. Brown, Ronald L. Castle, Arent, Fox, Kintner, Plotkin & Kahn, Washington, DC, for defendants.

## MEMORANDUM OPINION

KISER, Chief Judge.

This case is before the court on defendants' various motions for summary judgment. The court heard argument on the motions on July 22, 1992, and the motions are ripe for resolution. For the reasons stated herein, the court will grant summary judgment in favor of all defendants as to all plaintiffs' claims.

The court is guided in its consideration of the various motions by the familiar summary judgment standard, which was recently restated by the Fourth Circuit:

> Summary judgment is appropriate in those cases where there is no genuine dispute as to a material fact and the moving party is entitled to a judgment as a matter of law. Fed.R.Civ.P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). We must draw any permissible inference from the underlying facts in the light most favorable to the party opposing the motion. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986). Summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for

the non-moving party, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986), such as where the non-moving party has failed to make a sufficient showing on an essential element of the case that the non-moving party has the burden to prove. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

*Tuck v. Henkel Corp.*, 973 F.2d 371, 374 (4th Cir.1992). Abiding this standard, the court will set forth the facts and then turn to the motions.

## I.

Each of the individual plaintiffs [1] is black, and each earned or attempted to earn his living as a general laborer in construction work in or around Front Royal, Virginia. The plaintiffs brought suit for racial discrimination in employment against the Laborers' International Union of North America (the "International"), Local 691 of the International (the "Local"), and two employers, Riggs Distler & Company, Inc. ("Riggs") and Union Boiler Company ("Union Boiler"), alleging violations of Title VII, 42 U.S.C. § 2000e, and 42 U.S.C. § 1981. Plaintiffs' principal contention is that from January 1979 to the present, the Local has operated a racially discriminatory referral system.

The Local's territorial jurisdiction covers nine counties in northwestern Virginia. During the relevant time period, the Local operated a hiring hall under the supervision of George Cline, who was the business agent and secretary-treasurer of the Local. Under the hiring hall system, general laborers who wanted work advised the Local of that fact, and the Local referred those general laborers to specific jobs about which the Local had been notified by employers. From 1977 when he assumed office through November 1988, Cline never followed any particular system for referring laborers to available positions. Cline did not take applications, nor did he keep a list of names of laborers seeking work. Furthermore, Cline admitted that

the determination of laborers' qualifications was left to his discretion.

From 1977 through November 1989, the main sources of general laborer work in the Front Royal area were the manufacturing plant owned by Avtex, Inc. ("Avtex") and various contractors' construction projects associated with that plant. The Avtex contractors included defendants Riggs and Union Boiler.

In January 1979, a group of black laborers, including some of the plaintiffs, went to the Avtex site looking for work. The laborers met with representatives of the employers, including Riggs and Union Boiler. The laborers were told that the employers only hired through the hiring hall of the Local and were refused jobs. Upon leaving Avtex, the group went directly to the Local office and spoke with Cline. Plaintiff John Flynn, who acted as spokesman for the group, asked for jobs and union membership on the laborers' behalf. Cline refused to allow any of the group to join the Local, and he told them that there was no reason to sign up for the Local because there was no work. At the group's insistence, however, Cline took their names, addresses, and phone numbers in writing. Cline never called any of the group to refer them to jobs.

On March 1, 1979, the so-called NAACP Labor Committee wrote to the U.S. Commission on Civil Rights alleging discrimination under Title VII and under Executive Order 11246. The letter named as respondents the International, the Local, Riggs, and Union Boiler, and it named ten of the plaintiffs (Baltimore, Boller, John Flynn, Folks, Green, Johnson, McAfee, Smith, Spencer, and Turner) among the persons affected by discrimination. On March 19, 1979, the Commission on Civil Rights forwarded the letter to the U.S. Department of Labor's Office of Federal Contract Compliance Programs ("OFCCP"), which received the complaint on March 28, 1979. The OFCCP transferred the complaint to the Equal Employment Opportunity Commission ("EEOC") on November 20, 1980.

---

**1.** For purposes of discussion, Alfred Folks is considered a plaintiff, although he is deceased and represented in this action by his widow, Christine Folks. The capacity of Christine Folks to maintain suit on behalf of her husband is considered *infra.*

In early December 1980, the EEOC formulated a charge and sent a Notice of Charge of Discrimination with Copy of Charge to Riggs and Union Boiler. Riggs and Union Boiler received the charges later that month. The Local also received the charge, and in late December 1980, Cline called the International and spoke about the charge to Slater Hackley, the International's assistant regional manager for the region including the Local.

On February 26, 1981, the charge was amended to correct certain technical deficiencies found by the EEOC, and a Third Party Certification of Charge was prepared. Ten of the plaintiffs (Baltimore, Boller, Jerry and John Flynn, Folks, Green, McAfee, Smith, Travis, and Turner) signed the Third Party Certification, which named as respondents, among others, "George Kline [sic], Local 691," "Slator [sic] Hackley, Laborers [sic] International," "Riggs Distillers [sic]," and Union Boiler. The EEOC received the amended and verified charge on March 11, 1981. Thereafter, the EEOC conducted its investigation of the matter.

On March 26, 1987, the EEOC sent the International, the Local, Riggs, and Union Boiler a "Determination" regarding the charge of discrimination. A conciliation agreement signed in October 1988 by the Local and the International provided that the union shall maintain a registration list and refer each applicant for work in the order of each applicant's place on the registration list. The EEOC did not sign the conciliation agreement.

On March 5, 1990, the EEOC issued Notices of Right to Sue to James Kilby of the NAACP Labor Committee on behalf of eleven of the twelve individual plaintiffs and others. The Complaint in this action was filed on April 20, 1990.

In addition to the foregoing, the following relevant facts as to each plaintiff appear from the record. It should be stressed that these are simply facts, as distinguished from allegations or any party's interpretation of the facts.

*John L. Baltimore*

Baltimore was present at the January 1979 meeting at Avtex. (Pl.Exh. 1B, John Flynn dep. 1/29/91 at 26.)

Baltimore was named in the NAACP Labor Committee's letter of March 1, 1979, and he signed the Third Party Certification of Charge filed with the EEOC on March 11, 1981.

*Charles Boller*

Boller was present at the January 1979 meeting at Avtex. (*Id.* at 26.) He went to the Local office sometime in 1979 with John Flynn. (*Id.* at 138.)

Boller was named in the Labor Committee's letter, and he signed the Third Party Certification of Charge.

Boller retired in 1985. (Def.Exh. 31, Boller dep. 4/19/91 at 42.)

*Jerry Flynn*

Jerry Flynn was present at the January 1979 meeting at Avtex. (Pl.Exh. 43, McAfee dep. 1/31/91 at 72.) He went to the Local office following the Avtex meeting. (*Id.* at 74.) Also, Jerry Flynn went to the Local office sometime in 1979, 1981, and 1988 with John Flynn. (Pl.Exh. 1B, John Flynn dep. 1/29/91 at 140.)

Jerry Flynn was not named in the Labor Committee's letter, but he signed the Third Party Certification of Charge.

Additional facts regarding Jerry Flynn's § 1981 claim are set forth in Part VI–B *infra.*

*John Flynn*

John Flynn was present at the January 1979 meeting at Avtex (*id.* at 26.), and he went to the Local office following the Avtex meeting. (Pl.Exh. 43, McAfee dep. 1/31/91 at 74.) John Flynn asked Cline for a referral on three other occasions in January 1980; on those occasions, Cline told Flynn: (1) "I'm not going to hire you. I'm putting my own men to work. Go down in the 74 area." (Pl.Exh. 1A, John Flynn dep. 1/24/91 at 252–53.); (2) "I don't have no work and you'll have to go somewhere else and look for work. Go to 74 ..." (*id.* at 253–54.); and (3) "[G]o down to 74 where the rest of the brothers

are at." (*id.* at 254–55.) However, John Flynn contemporaneously stated that "[f]rom about March 1979, to October 29, 1981, I had no contact with anyone from local 691." (Pl. Exh. 65, John Flynn aff. 11/5/81 at 7.)

John Flynn was named in the Labor Committee's letter, and he signed the Third Party Certification of Charge.

In late October 1981, plaintiffs John Flynn, Charles Green, and Robert Turner sought jobs at a pipeline project near Front Royal. (*Id.* at 9.) The three men applied for jobs with the contractor, which is not a defendant, but were told by the project manager that the project was only hiring through the Local. Cline, who was working at the pipeline himself, told Flynn that he could get Flynn and Green jobs in Washington, D.C., but Flynn told Cline that he did not need Cline's help to get a job in D.C. Turner and ten more men were hired at the pipeline job after Flynn and Green attempted to get work there. (*Id.* at 11.)

Additional facts regarding John Flynn's § 1981 claim are set forth in Part VI–B *infra.*

*Alfred Folks*

Folks went to the Local office sometime in 1979, 1981, and 1982 with John Flynn. (Pl. Exh. 1B, John Flynn Dep. Jan. 29, 1991 at 140–41.)

Folks was named in the Labor Committee's letter, and he signed the Third Party Certification of Charge.

Folks died in 1987.

*Charles W. Green*

Green went to the Local office sometime in 1979 and 1981 with John Flynn. (*Id.* at 141.)

Green was referred by the Local to Riggs for an 8–hour job in September 1980. (Pl. Exh. 63, Green Aff. Nov. 5, 1981 at 2.) Thereafter, Green "got a nonunion job and stopped going to the union for work." *Id.*

At some unspecified time, Green was made the second foreman for Union Boiler at the Avtex plant. It is alleged that Cline called Jim Starnes, Union Boiler's superintendent at the Avtex project, and told him that one Bowers, a white man employed by Union Boiler at the site, should be the foreman and

not Green. Although the portion of the record referenced by the plaintiffs (Green Dep. 2/26/91 at 192–93) is not to be found, it appears that Green was qualified to be foreman yet was removed as foreman as a result of Cline's action.

Green was named in the Labor Committee's letter, and he signed the Third Party Certification of Charge.

*Lewis Johnson*

Johnson went to the Local office sometime in 1978, 1979, 1981, and 1983 with John Flynn. (Pl.Exh. 1B, John Flynn dep. 1/29/91 at 142–43.)

Johnson was named in the Labor Committee's letter, but he did not sign the Third Party Certification of Charge.

In October 1985, Johnson underwent surgery for removal of a brain tumor, and he has not been able to work since then. (Def.Exh. 42, Johnson Dep. 3/1/91 at 16–17.)

*Philip E. McAfee, Jr.*

McAfee was present at the January 1979 meeting at Avtex (Pl.Exh. 43, Def.Exh. 45, McAfee dep. 1/31/91 at 71–73; Pl.Exh. 1B, John Flynn dep. 1/29/91 at 26.), and he went to the Local office following the Avtex meeting. (Def.Exh. 45, McAfee dep. 1/31/91 at 74.) In addition, McAfee went to the Local office sometime in 1979 and 1981 with John Flynn. (Pl.Exh. 1B, John Flynn dep. 1/29/91 at 143.)

McAfee sought union membership from Cline in June 1980, but was told by Cline that the union was not accepting new members. (Pl.Exh. 43, McAfee dep. 1/31/91 at 94–95.)

McAfee was named in the Labor Committee's letter, and he signed the Third Party Certification of Charge.

*Jerome Smith*

Smith went to the Local office following the January 1979 meeting at Avtex, although it is not clear whether he was at Avtex. (Def.Exh. 45, McAfee dep. 1/31/91 at 74.) Smith went to the Local office with John Flynn sometime in 1979, 1981, and 1988. (Pl.Exh. 1b, John Flynn dep. 1/29/91 at 146.) According to Smith, "[f]rom 1979 until Octo-

ber 29, 1981 [he] had no contact with the union." (Pl.Exh. 61, Smith aff. 11/5/81 at 2–3.)

Smith was named in the Labor Committee's letter, and he signed the Third Party Certification of Charge.

Additional facts regarding Smith's § 1981 claim are set forth in Part VI–B *infra.*

*John Spencer*

Sometime in 1976, plaintiff Spencer asked Cline for a job, but was told that there were no openings. At Cline's request, Spencer put his name on a piece of paper; Cline told Spencer that Cline would contact him. Spencer visited the Local every other day for the next six to twelve months. At the end of this period, when Spencer asked Cline why Spencer could not get a referral despite persistent attempts, Cline "came out from behind his desk with his fist balled up and proceeded to say to [Spencer] that you people think somebody owes you something." Spencer asked Cline, "[W]hat do you mean by you people?" Cline "proceeded to tell [Spencer] to get out of his office, there were no jobs there." (Def.Exh. 49, Spencer dep. 2/15/91 at 130–32.)

Spencer went to the Local office with John Flynn sometime in 1979, 1981, 1983, and 1988. (Pl.Exh. 1B, John Flynn dep. 1/29/91 at 146.)

Spencer was named in the Labor Committee's letter, but he did not sign the Third Party Certification of Charge.

Additional facts regarding Smith's § 1981 claim are set forth in Part VI–B *infra.*

*James Travis*

Travis went to the Local office with John Flynn sometime in 1979, 1981, and 1983. (*Id.* at 147.)

Travis was not named in the Labor Committee's letter, but he signed the Third Party Certification of Charge.

*Robert Turner*

Turner went to the Local office with John Flynn sometime in 1978, 1979, 1981, and 1983. (*Id.*)

Turner was named in the Labor Committee's letter, and he signed the Third Party Certification of Charge.

Additional facts regarding Turner's § 1981 claim are set forth in Part VI–B *infra.*

\*　\*　\*　\*　\*　\*

The defendants have filed numerous motions for summary judgment, which raise the following issues:

(1) whether the NAACP Labor Committee has standing,

(2) whether Christine Folks may maintain suit on behalf of her deceased husband, Alfred Folks,

(3) whether plaintiffs' Title VII claims are barred by the statute of limitations,

(4) whether plaintiffs' Title VII claims are barred by the doctrine of laches,

(5) whether each plaintiff has stated a prima facie case of disparate treatment under Title VII,

(6) whether plaintiffs' 42 U.S.C. § 1981 claims are barred by the statute of limitations,

(7) whether each plaintiff has stated a prima facie case of intentional discrimination under § 1981, and

(8) whether the International, Riggs, or Union Boiler may be held liable on an agency theory.

The parties have fully briefed and argued the issues, which are now ripe for decision. In addition, the plaintiffs have moved to amend their complaint to add other identically situated black laborers as plaintiffs.

## II.

The court will first address the standing issues involving the NAACP Labor Committee and Christine Folks.

■ The defendants have moved for partial summary judgment to dismiss the NAACP Labor Committee as a party plaintiff. They contend that the NAACP Labor Committee lacks standing. The plaintiffs have not responded to the motions. As explained below, because the NAACP Labor Committee lacks standing, the court will grant defendants' motions to dismiss the

NAACP Labor Committee as a party plaintiff.

An association may allege standing under either of two distinct theories: (1) "the association 'may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy;'" or (2) "the association may have standing as the representative of its members who have been harmed." *Maryland Highways Contractors v. State of Maryland*, 933 F.2d 1246, 1250 (4th Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 325 (1991) (quoting *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975)). The NAACP Labor Committee does not have standing under either theory.

First, the NAACP Labor Committee does not have standing to sue in its own right. An association has no standing to sue if it has suffered no direct economic injury as a consequence of the conduct about which it complains. *See Maryland Highways Contractors*, 933 F.2d at 1250. In this case, there is no allegation of and no prayer for relief from any such injury. Moreover, even if the NAACP Labor Committee's broad purposes have been violated by the alleged discriminatory conduct, that type of injury is insufficient to support standing. *Id.* at 1251.

Second, the NAACP Labor Committee does not have standing to sue as the representative of its members. "An organization has representational standing when (1) its own members would have standing to sue in their own right; (2) the interests the organization seeks to protect are germane to the organization's purpose; and (3) neither the claim nor the relief sought requires the participation of individual members in the lawsuit." *Id.* (citing *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343, 97 S.Ct. 2434, 2441, 53 L.Ed.2d 383 (1977)). Arguably the first two prongs are satisfied in this case, but certainly the third prong is not. Both the claim and especially the relief sought—back pay, compensatory damages, and punitive damages—require the participation of individual members of the NAACP Labor Committee. Clearly the claim and the relief sought relate exclusively to injury to the personal interests of individual members and not to any injury to associational interests or ties.

In sum, the NAACP Labor Committee lacks standing under either theory. Accordingly, defendants' motions for partial summary judgment to dismiss the NAACP Labor Committee as a party plaintiff will be granted.

### III.

In addition, the defendants have moved for partial summary judgment to dismiss Christine Folks as a party plaintiff. They contend that she has not qualified under Virginia law as the personal representative for her deceased husband, Alfred Folks, and, therefore, she cannot maintain suit on his behalf. The plaintiffs counter in part by arguing that the defendants have waived their right to challenge Mrs. Folks's capacity or authority to sue. For the reasons that follow, defendants' motion for partial summary judgment to dismiss Mrs. Folks will be denied.

The capacity of Christine Folks to sue on behalf of her deceased husband, Alfred Folks, must be determined under Virginia law. *See* Fed.R.Civ.P. 17(b). Under Virginia law, the personal representative, either the executor or the administrator, is the proper party to litigate on behalf of a decedent's estate. *See Burns v. Equitable Assocs.*, 220 Va. 1020, 265 S.E.2d 737, 741 (1980). To qualify as the personal representative or administrator of an intestate decedent's estate, the person seeking to act as such must apply to the appropriate circuit court; "[a]dministration shall be granted to the distributees who apply therefor, preferring first the husband or wife." Va.Code §§ 64.1–118, 64.1–119.

In their complaint, the plaintiffs allege that "Christine Folks is the widow and personal representative of the estate of Alfred Folks."[2] However, it is uncontrovert-

---

**2.** Paragraph 11 of plaintiffs' Complaint states in pertinent part:

ed on the record that neither Mrs. Folks nor anyone else has qualified as the administrator of her deceased husband's estate. Therefore, Mrs. Folks lacks legal capacity to maintain this action on behalf of her deceased husband. However, that does not end the inquiry.

The plaintiffs argue that the defendants have waived their right to challenge Mrs. Folks's capacity to sue. The plaintiffs rely on Fed.R.Civ.P. 9(a), which provides in part:

> When a party desires to raise an issue as to the legal existence of any party or the capacity of any party to sue or be sued or the authority of a party to sue or be sued in a representative capacity, the party desiring to raise the issue shall do so by specific negative averment, which shall include such supporting particulars as are peculiarly within the pleader's knowledge.

Because the defendants did not raise the issue in their pleadings "by specific negative averment," contend the plaintiffs, the defendants have waived their right to raise the issue now. The court agrees.

In their answers, each of the defendants denies plaintiffs' allegation that Christine Folks is the personal representative of Alfred Folks.[3] However, a general denial does not constitute a "specific negative averment" within the meaning of Rule 9(a). Nor does a denial of plaintiff's capacity for want of knowledge or information sufficient to form a belief constitute a "specific negative averment," especially where the plaintiff sues as a personal representative and this is a matter of public record easily ascertainable. See 2A James W. Moore et al., Moore's Federal Practice ¶ 9.02 (2d ed. 1992). Moreover, the defendants first raised the issue of Mrs. Folks's capacity more than two years after she and the other plaintiffs filed this action.

While neither the Fourth Circuit nor any federal district court within the Fourth Circuit has relied on Rule 9(a) to hold a party to have waived the right to raise the issue of capacity, numerous other courts in various circuits have found waiver where the issue was not raised by pleading or motion before pleading. See, e.g., Wagner Furniture Interiors, Inc. v. Kemner's Georgetown Manor, Inc., 929 F.2d 343 (7th Cir.1991); Lang v. Texas & Pacific Ry. Co., 624 F.2d 1275 (5th Cir.1980); Garbincius v. Boston Edison Co., 621 F.2d 1171 (1st Cir.1980); Summers v. Interstate Tractor & Equipment Co., 466 F.2d 42 (9th Cir.1972). Although the court has discretion under the liberal amendment policy of Fed.R.Civ.P. 15(a) to allow the defendants to amend their answers to assert a capacity defense, see 5 Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1295 (1990), the court is not inclined to allow amendment at this stage of the litigation.

Accordingly, under the circumstances of this case, the court finds that the defendants have waived their right to challenge Mrs. Folks's capacity to sue. Thus, the court will deny defendants' motion to dismiss Mrs. Folks on this ground.

## IV.

Next, the defendants have moved for summary judgment on the ground that plaintiffs' Title VII claims are barred for plaintiffs' failure to file a timely charge of discrimination.

Under Title VII, a charge must be filed with the EEOC within one hundred and eighty days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e–5(e). However, "filing a timely charge of discrimination with the EEOC is not a jurisdictional prerequisite to suit in federal court, but a requirement that, like a

---

11. Christine Folks is the widow and personal representative of the estate of Alfred Folks ("Folks"). Folks was a black construction worker who resided in Front Royal, Virginia and who had sought work in the jurisdiction of the International and Local.... On March 5, 1990, the EEOC issued a right to sue letter containing his name and stating his right to sue all Defendants.

3. The International, Riggs, and Union Boiler each disclaim knowledge or information sufficient to form a belief as to the truth of the allegation. Their disclaimers have the effect of denial. See Fed.R.Civ.P. 8(b). The Local specifically denies the allegation.

statute of limitations, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982). "The timely filing requirement serves two primary purposes: to give notice to the charged party and to give the EEOC an opportunity to settle the grievance." *Kilgo v. Bowman Transp., Inc.,* 789 F.2d 859, 876–77 (11th Cir.1986). For the reasons stated, the court will grant defendants' motions based on plaintiffs' failure to file a timely charge of discrimination.

The case at bar raises difficult questions as to when the alleged unlawful employment practices occurred, when the plaintiffs filed their charge, for which plaintiffs that charge was effective, and whether that charge was timely relative to the alleged unlawful employment practices. Before analyzing these questions, the court will review the relevant facts, again in the light most favorable to the plaintiffs.

On March 1, 1979, the NAACP Labor Committee wrote to the Commission on Civil Rights alleging discrimination under Title VII and Executive Order 11246. (Plaintiffs' Ex. 66). The letter named the International, the Local, Riggs, and Union Boiler as parties involved in the alleged discrimination, and listed ten of the plaintiffs (Baltimore, Boller, John Flynn, Folks, Green, Johnson, McAfee, Smith, Spencer, and Turner) as persons affected by the alleged discrimination. Three officers of the NAACP Labor Committee, none of whom is a named plaintiff, signed the letter, which was received by the Commission on Civil Rights on March 12, 1979.

On March 19, 1979, the Commission on Civil Rights forwarded the letter to the OFCCP, which received the letter on March 28, 1979. (Pl.Exh. 67). The OFCCP in turn transferred the complaint to the EEOC on November 20, 1980. (Pl.Exh. 68). In its transmittal letter to EEOC, the OFCCP stated that "the complaint . . . was filed with [the OFCCP] in a timely manner in March 1979.

However, no action was taken since the facts were not clear as to the basis of the problem." *Id.* The precise date of receipt by the EEOC does not appear from the record.

The EEOC prepared a charge and sent a Notice of Charge of Discrimination with Copy of Charge dated December 18, 1980 to the Local, Riggs, and Union Boiler. Riggs received the charge on December 22, 1980 and the Local and Union Boiler presumably received their charges on or about that date. While the International did not receive a separate charge, the International learned of the charge in late December 1980 when Cline called the International and spoke to Hackley about the charge. (Pl.Exh. 78).

In February 1981, the charge was amended to correct certain deficiencies found by the EEOC and a Third Party Certification of Charge was prepared. Ten of the plaintiffs (Baltimore, Boller, Jerry and John Flynn, Folks, Green, McAfee, Smith, Travis, and Turner) signed the Third Party Certification, which named as respondents, among others, "George Kline [sic], Local 691," "Slator [sic] Hackley, Laborers [sic] International," "Riggs Distillers [sic]," and Union Boiler. The EEOC received the Amended and Perfected Charge and Third Party Certification of Charge on March 11, 1981. (Def.Exh. 18).

### A.

■ First, the court must determine when the charge was filed. The plaintiffs maintain that they filed a charge on March 28, 1979, the date the OFCCP received the NAACP Labor Committee's letter.[4] On the other hand, the defendants contend that the charge in this case was filed on March 11, 1981, the date the EEOC received plaintiffs' Amended and Perfected Charge and Third Party Certification of Charge. However, for the reasons that follow, the court finds that plaintiffs' charge was filed with the EEOC on November 20, 1980.

---

**4.** The plaintiffs choose to overlook the fact that the NAACP Labor Committee's letter was filed by it not with the OFCCP, but rather with the Commission on Civil Rights. The court notes that the plaintiffs consider the charge filed with the OFCCP as of the date of receipt by the OFCCP rather than as of the date of receipt by the Commission on Civil Rights. Thus, it appears that the plaintiffs do not contend that filing with the Commission on Civil Rights constitutes filing with the OFCCP or the EEOC.

In support of their position, the plaintiffs rely primarily on a 1974 Memorandum of Understanding (the "Memorandum") between the Office of Federal Contract Compliance ("OFCC," now OFCCP) and the EEOC and on *Reynolds Metals Co. v. Rumsfeld,* 564 F.2d 663 (4th Cir.1977), *cert. denied,* 435 U.S. 995, 98 S.Ct. 1646, 56 L.Ed.2d 84 (1978), in which the Fourth Circuit reviewed the Memorandum. In *Rumsfeld,* the Fourth Circuit considered, *inter alia,* the validity of paragraph 10 of the Memorandum, which provides that "[c]omplaints filed with OFCC shall be deemed charges filed with EEOC and OFCC shall promptly transmit such charges to the appropriate EEOC District Office." The district court had held that paragraph 10 was invalid because, although it implicated a substantive right, it was not promulgated in accordance with the notice and comment requirements of the Administrative Procedure Act. 417 F.Supp. 365, 372 (E.D.Va.1976). On appeal, the Fourth Circuit reversed, upholding paragraph 10 on the grounds that it only implicates a procedural right and, thus, was properly promulgated without notice and comment, and, further, that it lawfully delegates the OFCC's responsibility for processing complaints. In so ruling, the court recognized that under paragraph 10, the OFCC serves as merely a conduit to receive misdirected Title VII complaints and "promptly transmit" them to the EEOC. The court wrote:

> It would be irresponsible for the compliance office to do nothing upon receipt of a complaint that charges a violation of Title VII. Returning the complaint to the employee with the suggestion that he send it to the commission would delay the administrative process and would accomplish nothing more than transmission by the compliance office.

564 F.2d at 668. The court's view of the OFCC as a mere conduit is borne out by its characterization of paragraph 10 as not implicating a substantive right. Unless the complaint is "promptly transmitted" to the appropriate EEOC district office, as the Memorandum requires, the Title VII remedial scheme cannot be triggered.

This common-sense interpretation of paragraph 10 of the Memorandum comports with the Fourth Circuit's analysis of a similar work-sharing agreement in *Petrelle v. Weirton Steel Corp.,* 953 F.2d 148 (4th Cir.1991). That case involved an agreement between the EEOC and the West Virginia Human Rights Commission ("WVHRC") providing that "the EEOC and the WVHRC each designates the other as its agent for the purpose of receiving charges." *Id.* at 152. The EEOC, as amicus, argued that under its regulations, filing with it constituted filing with the state agency. *Id.* However, focussing on the agreement, the court held that charges filed with the EEOC must be referred to the WVHRC to commence proceedings before the WVHRC. *Id.* at 153.

*Rumsfeld* and *Petrelle* suggest that the date of actual receipt of the referral is determinative. While the *Rumsfeld* court specifically declined to consider the effect of paragraph 10 of the Memorandum on the Title VII limitations period, 564 F.2d at 670 n. 12, the reasoning of both cases suggests that "filing" for purposes of the Title VII limitations period cannot take place until the EEOC actually receives the charge. The case at bar demonstrates the fallacy of holding that a complaint filed with the OFCCP is a charge "filed" with the EEOC; in this case the OFCCP held the complaint for 20 months, during which time the Title VII remedial process had not been triggered.

Furthermore, a strict reading of the statute is supported by the Supreme Court case of *Mohasco Corp. v. Silver,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980). In resolving whether the charge in that case was timely, the Court was forced to reconcile two subsections of Title VII, 42 U.S.C. § 2000e–5(c) and (e). In a so-called "deferral state," such as New York, a charge must be "filed" within 300 days after the alleged unlawful employment practice occurred. 42 U.S.C. § 2000e–5(e). In addition, however, "no charge may be filed ... before the expiration of sixty days after proceedings have been commenced under State or local law, unless such proceedings have been earlier terminated." 42 U.S.C. § 2000e–5(c). In *Mohasco,* the complainant submitted a charge to the

EEOC 291 days after his alleged discriminatory discharge. The EEOC promptly referred the letter to the New York State Division of Human Rights.

The Court construed 42 U.S.C. §§ 2000e–5(c) and (e) so as to give the word "filed" the same meaning in both subsections. While the Court recognized that it was proper for the EEOC to hold the "complaint in 'suspended animation,' *automatically filing it upon termination of the state proceedings*," the Court held that the complainant's charge was not timely because it was "filed" with the EEOC 351 days after the alleged discrimination. *Id.* at 817, 100 S.Ct. at 2493 (quoting *Love v. Pullman Co.*, 404 U.S. 522, 526, 92 S.Ct. 616, 618, 30 L.Ed.2d 679 (1972)) (emphasis in *Mohasco* ). The Court rejected the complainant's argument that this literal reading is unfair to victims of discrimination who often proceed without the assistance of counsel; a lay person "who carefully read the entire section would understand it to mean exactly what it says." *Id.* at 825, 100 S.Ct. at 2497. Significantly, the Court concluded that "in the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law." *Id.* at 826, 100 S.Ct. at 2497.

■ In light of *Mohasco*, this court cannot and will not overlook the statutory requirement that a charge be filed *with the EEOC*. 42 U.S.C. § 2000e–5(e). However, the court will consider a charge filed at another agency and forwarded to the EEOC as filed with the EEOC as of the date of receipt by the EEOC. Only after the EEOC receives the charge can the remedial process begin; the filing of the charge with the EEOC triggers the entire process. For example, under 42 U.S.C. § 2000e–5(b), the EEOC must notify a respondent of a charge within ten days after the charge is filed, and make an investigation of the charge. Also, under 42 U.S.C. § 2000e–5(f)(1), the EEOC may bring suit against a private respondent if the EEOC has been unable to secure an acceptable conciliation agreement "within thirty days after a charge is filed with the Commission." Similarly, the time for issuance of a right to sue notice runs from the

time a charge is filed with the EEOC. 42 U.S.C. § 2000e–5(f)(1). The process cannot be timely set in motion when a charge is mailed to the Commission on Civil Rights or any other agency unless that charge is timely received by the EEOC. Additionally, EEOC regulations support the court's use of the date of actual receipt. For example, pursuant to 29 C.F.R. § 1601.12(b), amendments to a charge "will relate back to the date the charge was first received."

In this case, the OFCCP forwarded the NAACP Labor Committee's letter to the EEOC on November 20, 1980. While it is not clear when the EEOC actually received the letter from the OFCCP, the record indicates that the EEOC had received the letter by December 15, 1980 at the latest. (Def.Exh. 14). However, giving maximum benefit to the plaintiffs, as the non-moving party, the court will consider the letter to have been received by the EEOC on November 20, 1980. As the defendants point out, the EEOC itself did not consider a charge to have been filed with it until on or after November 20, 1980; only thereafter, in December 1980, the EEOC issued notices of the charge to the Local, Riggs, and Union Boiler. Accordingly, the court finds that a charge was filed on November 20, 1980.

■ This court declines to join the handful of courts which have ruled that filing with the OFCCP satisfies the requirement of filing with the EEOC. *See, e.g., Egelston v. State University College*, 535 F.2d 752, 755 n. 4 (2d Cir.1976); *Dickerson v. U.S. Steel Corp.*, 439 F.Supp. 55, 68 (E.D.Pa.1977); *EEOC v. Delaware Trust Co.*, 416 F.Supp. 1040, 1045 (D.Del.1976). These cases simply overlook the plain language of Title VII, which requires a charge to be filed *with the EEOC*. 42 U.S.C. § 2000e–5. In addition, these cases are distinguishable on other grounds.

In *Egelston, supra*, the Second Circuit reviewed the district court's grant of a motion to dismiss a Title VII lawsuit. Egelston was notified in May 1972 that her employment contract would not be renewed. She filed a complaint with the OFCC in January 1973, and eventually left her position in June 1973. At the outset, the Second Circuit recognized

that dismissal of an action on a motion to dismiss must be ordered very sparingly. 535 F.2d at 754. Additionally, the court observed that "Title VII is rife with procedural requirements which are sufficiently labyrinthine to baffle the most experienced lawyer, yet its enforcement mechanisms are usually triggered by laymen." *Id.* The court interpreted *Love v. Pullman Co.*, 404 U.S. 522, 92 S.Ct. 616, 30 L.Ed.2d 679 (1972), as permitting a liberal reading of the filing requirements and adopted what it termed a "flexible stance in interpreting Title VII's procedural provisions." 535 F.2d at 755. With these observations, the court reversed the dismissal.

However, in *Egelston,* 535 F.2d 752 (2d Cir.1976), as in the Fourth Circuit case of *Rumsfeld,* time was not the critical factor. In a footnote, the Second Circuit stated that it "consider[ed] the filing with the OFCC as constituting a filing with the EEOC," *id.* at 755 n. 4, but there was no indication as to when the complaint was forwarded to or filed with the EEOC. In addition, the court found that the Title VII time limit was only triggered when Egelston actually left her position in June 1973 or when a replacement was hired, which date does not appear on the sparse record, not when she was notified in May 1972 that her contract would not be renewed. Moreover, while it may be inferred that the court relied on the OFCC–EEOC 1974 Memorandum of Understanding, the court does not discuss or analyze that Memorandum. In short, the court simply does not hold that filing with the OFCC constitutes filing with the EEOC for purposes of the Title VII limitations period.

In *Delaware Trust,* 416 F.Supp. 1040 (D.Del.1976), one Hsu sent a letter to the EEOC Philadelphia branch several days after alleged discrimination against her. Unbeknownst to Hsu, four months earlier the EEOC had moved its Philadelphia office to a new address several blocks away. The letter was returned to Hsu, rather than forwarded to the new address. She sent a second letter to the "Federal Department of Labor, Equal Opportunities for Employment Division (Complaint Department)" in Washington, D.C. 439 F.Supp. at 1043. This second letter

was "unaccountably routed" to the OFCC which received it within a month after the alleged discrimination. *Id.* Four months later, the OFCC forwarded the letter to the EEOC.

Under the circumstances, the court concluded that the complainant's charge was timely filed. One factor in the court's decision was that the OFCC received Hsu's letter within a month of the alleged discriminatory conduct. *Id.* at 1045. However, the court did not hold that filing with the OFCC constituted filing with the EEOC. Rather, the court applied the doctrine of equitable tolling, stating that:

> Even if the October 28th receipt of the letter by the OFCC would not constitute a pre-deferral federal "filing," staying application of the federal deadline until state deferral terminated, it can still be construed in a somewhat similar manner as an intervening occurrence which precipitated an equitable "tolling" of the deadline for the filing of a charge with the EEOC.

*Id.* Significantly, the court noted that the circumstances which delayed the filing of the complainant's charge were "beyond Hsu's control." *Id.* at 1046.

Similarly, in *Dickerson,* 439 F.Supp. 55 (E.D.Pa.1977), the court relied on equitable estoppel to permit the plaintiffs to file a charge with the EEOC after the expiration of the Title VII filing period. But the court did not hold that the filing of a complaint with the Department of Labor was tantamount to filing with the EEOC. The *Dickerson* court relied at least in part on *Egelston* and *Delaware Trust* for its liberal application of the filing requirements. 439 F.Supp. at 68.

Finally, *Egelston, Delaware Trust,* and *Dickerson* were all decided after *Love, supra,* in which the Supreme Court took a relatively liberal approach to Title VII filing requirements, but before *Mohasco, supra,* in which the Supreme Court eschewed that approach in favor of strict interpretation. In summary, the cases cited by the plaintiffs do not persuade this court to deem a complaint filed with the OFCCP as simultaneously "filed" with the EEOC for purposes of tolling the Title VII limitations period. Only when the

EEOC actually receives the charge does the clock stop.

### B.

Having found that a charge was filed with the EEOC on November 20, 1980, the court must next determine for which plaintiffs that charge was filed.

With respect to the charge and compliance with the requirements for a valid charge, the plaintiffs fall into three factual groups: (1) eight plaintiffs (Baltimore, Boller, John Flynn, Folks, Green, McAfee, Smith, and Turner) were named in the NAACP Labor Committee's letter *and* signed the Third Party Certification of Charge; (2) two plaintiffs (Johnson and Spencer) were named in the NAACP Labor Committee's letter but never signed a Third Party Certification; and (3) two plaintiffs (Jerry Flynn and Travis) signed the Third Party Certification but were not named in the NAACP Labor Committee's letter. The charge accompanying the notice issued by the EEOC in December 1980 indicates "Labor Committee for NAACP" as the complainant and charges that "Blacks as a Class" have been discriminated against.

■ First, the defendants argue that plaintiffs' original charge was invalid because it was unsworn. The plaintiffs respond that their subsequent Third Party Certification cured that defect and related back to the date of the original charge.

Title VII requires that "[c]harges shall be in writing under oath or affirmation and shall contain such information and be in such form as the Commission requires." 42 U.S.C. § 2000e–5(b). However, the EEOC has promulgated regulations providing that "[a] charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments ... will relate back to the date the charge was first received." 29 C.F.R. § 1601.12(b).[5]

Several courts of appeal have relied on the EEOC regulations to permit the subsequent verification of a charge. For example, in *Philbin v. General Elec. Capital Auto Lease, Inc.*, 929 F.2d 321 (7th Cir.1991), relied upon by the plaintiffs here, the complainant had filed a charge within the 300–day statutory filing period. As originally filed, the charge was not signed under oath or affirmation; however, the charge was later verified after the expiration of the filing period. Finding that the charge was timely and valid, the court of appeals stated that "the omission of technical requirements which are later fulfilled should not affect the timeliness or validity of the charge." *Id.* at 324. In so ruling, the court relied on the relation-back provision of the EEOC regulation. *See* 29 C.F.R. § 1601.12(b).

Other courts of appeal have similarly interpreted the statute and regulations. *See e.g., Peterson v. City of Wichita,* 888 F.2d 1307, 1308–09 (10th Cir.1989), *cert. denied,* 495 U.S. 932, 110 S.Ct. 2173, 109 L.Ed.2d 502 (1990); *Casavantes v. California State Univ.,* 732 F.2d 1441, 1442–43 (9th Cir.1984); *see also Price v. Southwestern Bell Tel. Co.,* 687 F.2d 74, 77–79 (5th Cir.1982). These cases are based on the conception that the primary function of the administrative charge is to provide an adequate factual basis for the initiation of investigation and conciliation by the EEOC as contemplated by Title VII. *See, e.g., Price,* 687 F.2d at 78.

■ While the Fourth Circuit has not considered the effect of the subsequent verification of a charge, it has recognized that technical defects will not render a charge invalid. In *Waiters v. Robert Bosch Corp.,* 683 F.2d 89 (4th Cir.1982), the complainant filed an affidavit identifying the parties, the nature of the discrimination, the date of the discriminatory act, and the circumstances supporting the charge, but omitting the employer's address. The complainant submitted the affidavit within the 300–day filing period. Later, after expiration of the filing period, the complainant ·filed a complete

---

5. The same regulation also provides that "a charge is sufficient when the Commission receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." 29 C.F.R. § 1601.12(b).

charge. The district court dismissed the case for failure to comply with the 300–day filing period. The Fourth Circuit reversed, holding that the affidavit, though technically defective, was sufficient to constitute a charge of discrimination. *Id.* at 88. Like *Philbin, Waiters* shows that the failure to meet technical requirements will not affect the timeliness or validity of a charge.

This court itself encountered similar facts in *EEOC v. Wayside World Corp.,* 646 F.Supp. 86 (W.D.Va.1986) (Michael, J.). There the complainant filed an improperly sworn charge within the 180–day statutory filing period. A "perfected" charge, properly sworn, was filed six months later. Like the Seventh Circuit in *Philbin,* this court relied on 42 U.S.C. § 2000e–5(b) and 29 C.F.R. § 1601.12(b) to conclude that the "perfected" charge related back to the date of the original charge, even though the respondent did not receive notice of the original charge until after the "perfected" charge was filed. *Id.* at 88.

In the case at bar, the technical defect was subsequently cured when the plaintiffs submitted their Amended and Perfected Charge and Third Party Certification of Charge. Based on the case law discussed above and on 29 C.F.R. § 1601.12(b), this court finds that the Third Party Certification filed on March 11, 1981 relates back to the date of original filing of the charge, that is November 20, 1980. The subsequent verification of the charge served to cure the defect of its omission. Moreover, the subsequent verification rendered immaterial the fact that the charge issued by the EEOC in December 1980 named only "Labor Committee for NAACP" as the complainant. Thus, the charge was valid and filed on November 20, 1980 as to the ten plaintiffs who signed the Third Party Certification.

■ Second, the defendants argue that plaintiffs Johnson and Spencer must be dismissed because they never signed a charge. The plaintiffs counter that the so-called "single-filing" theory enables a non-charging plaintiff to join a Title VII lawsuit initiated by a similarly situated plaintiff who filed a timely charge.

In *Lilly v. Harris–Teeter Supermarket,* 720 F.2d 326, 334–35 (4th Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984), one of the issues was whether the district court erred in allowing individuals who had not exhausted their administrative remedies to intervene in a Title VII class action. The Fourth Circuit upheld the district court in this respect because the administrative remedies of some of the plaintiffs with respect to similar claims had been exhausted and because there was "no indication that any discrimination claims against the company could be settled out of court." *Id.* at 335.

■ The single-filing rule also applies in a non-class action. The former Fifth Circuit offered a plain statement of the rule, which was subsequently adopted by the Eleventh Circuit: "[I]n a multiple-plaintiff, non-class action suit, if one plaintiff has filed a timely EEOC complaint as to that plaintiff's individual claim, then co-plaintiffs with individual claims arising out of similar discriminatory treatment in the same time frame need not have satisfied the filing requirement." *Allen v. United States Steel Corp.,* 665 F.2d 689, 695 (5th Cir. Unit B 1982). *See also Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 449 (11th Cir.1993) (extending single-filing rule to permit a plaintiff to rely on an EEOC charge filed by another plaintiff in another lawsuit). It follows that a plaintiff who has not filed a charge may not rely on the *untimely* charge of another.

Accordingly, if the plaintiffs' charge is found timely, then Johnson and Spencer may rely on that charge to satisfy the filing requirement. On the other hand, if the plaintiffs' charge is found untimely, then Johnson and Spencer may not rely on that charge, and neither the ten charging plaintiffs nor Johnson and Spencer can maintain Title VII suits. Thus, it may be assumed for purposes of discussion that Johnson and Spencer joined the other plaintiffs' charge.

For the foregoing reasons, the court finds that a charge was filed as to all of the plaintiffs on November 20, 1980. However, the question remains whether the charge then filed was timely.

## C.

Given that the charge in this case was filed on November 20, 1980, an alleged unlawful employment practice must have occurred on or after May 24, 1980 to fall within the 180–day Title VII limitations period. There are not sufficient facts in the record to establish any discriminatory conduct by any of the defendants against any of the plaintiffs at any time between May 24, 1980, and November 20, 1980. Only two plaintiffs had any contact at all with any of the defendants during that period. Plaintiff Green was referred by the Local to Riggs in September 1980.[6] And plaintiff McAfee sought union membership from Cline in June 1980, but was simply told by Cline that the union was not accepting new members. Of course, without more—and no more is before the court—these contacts do not amount to violations. It appears, therefore, that plaintiffs' charge is untimely with respect to every plaintiff's Title VII claims.

However, the plaintiffs argue that this case involves a "continuing pattern or practice violation" which began in the 1970s, continued up to and through the filing date of their Title VII charge, and continues even today. Therefore, the plaintiffs contend, it is immaterial whether the charge is deemed to have been filed on March 28, 1979, March 11, 1981, or any other date.

Indeed the so-called "continuing violation" doctrine does apply in Title VII cases. *See, e.g., United Air Lines, Inc. v. Evans,* 431 U.S. 553, 557–58, 97 S.Ct. 1885, 1888–89, 52 L.Ed.2d 571 (1977); *Nealon v. Stone,* 958 F.2d 584, 590 n. 4 (4th Cir.1992); *Hill v. AT & T Technologies, Inc.,* 731 F.2d 175, 180 (4th Cir.1984); *Woodard v. Lehman,* 717 F.2d 909, 914–16 (4th Cir.1983). However, "a mere allegation of continuing discrimination without any identification of a discriminatory event within the statute of limitations period is insufficient to prove a continuing violation of Title VII." *Nealon,* 958 F.2d at 592 (citing *Woodard,* 717 F.2d at 914–16). To suspend the time requirement for the filing of a charge in the face of a mere allegation of a continuing violation would "de-

stroy the policies of finality and repose inherent in the filing requirement of Title VII." *Hill,* 731 F.2d at 180. Similar concerns are echoed in commentary cited by the Fourth Circuit:

> The Title VII filing period serves an important function in the statutory scheme: it protects potential defendants from perpetual liability for alleged violations of the law. Courts should not succumb to the temptation to grant relief in hard cases through the invocation of questionable legal doctrines to circumvent the filing requirement. Thus, after *United Air Lines, Inc. v. Evans* [*supra*] the continuing violation theory may no longer be utilized when the plaintiff is unable to allege a present violation of the Act. Conclusory allegations that a violation continues should also no longer be sufficient. In addition, that a plaintiff suffers the effects of past discriminatory acts will not suffice to supply a viable cause of action.

*Woodard,* 717 F.2d at 915 n. 11 (quoting Jackson & Matheson, *The Continuing Violation Theory and the Concept of Jurisdiction in Title VII Suits,* 67 Geo.L.J. 811, 851 (1979)).

"It is *only* where an actual violation has occurred within that requisite time period that under any possible circumstances the theory of continuing violation is sustainable." *Woodard,* 717 F.2d at 915 (emphasis in original). In other words, if at least one of a series of separate acts falls within the statutory period, "the effect . . . is to sweep within the limitations period the earlier alleged acts of discrimination." *Bradley v. Carydale Enterprises,* 707 F.Supp. 217, 222 (E.D.Va.1989) (suit under 42 U.S.C. § 1981).

The plaintiffs largely depend on two 1978 cases from the Eastern District of Virginia, *White v. City of Suffolk,* 460 F.Supp. 516 (E.D.Va.1978), and *Wilson v. Allied Chemical Corp.,* 456 F.Supp. 249 (E.D.Va.1978). In *White,* black employees of the Suffolk police department brought a suit charging racially discriminatory employment practices in violation of Title VII and 42 U.S.C. § 1981.

---

**6.** The alleged incident in which Green was fired as foreman from Union Boiler cannot be the basis for a claim, because there is no evidence as to when that incident occurred.

While the plaintiffs alleged "far more than one occurrence of racial discrimination," 460 F.Supp. at 519, they alleged at least one occurrence within the 180–day limitations period under Title VII. The court found that "plaintiffs' complaint as a whole describe[d] a past *and present pattern* of discrimination...." *Id.* at 519–20 (emphasis on "pattern" in original; other emphasis added). On these facts, the court held that the limitations period would not bar the plaintiffs from recovering for claims grounded in events occurring before the limitations period. *Id.* Clearly the court did not dispense with the requirement that there be an actual violation within the limitations period.

In *Wilson,* the court held that plaintiffs' claims based on the continuing effects of past violations involving defendant's seniority system were barred because the plaintiffs had not filed a timely EEOC charge as to those past violations. 456 F.Supp. at 253. In addition, the court considered plaintiffs' claims based on discriminatory promotions. As to the latter claims, the defendant asserted that the plaintiffs had not filed an EEOC charge within 180 days of the last promotion about which they complained. *Id.* at 252. Nevertheless, upon finding that the plaintiffs alleged "continuing *violations,* not just continuing results of past violations," the court held that these claims were not barred. *Id.* at 253 (emphasis in original). The court's opinion, although somewhat ambiguous, implies that the plaintiffs alleged a present violation within the limitations period.

Of course, neither *White* nor *Wilson* is binding on this court. Moreover, they predate the Fourth Circuit continuing violation cases, which are binding. In any event, at least *White,* if not *Wilson,* is consistent with the Fourth Court's continuing violation theory. In short, this court finds nothing in either *White* or *Wilson* to justify a departure from the subsequent, clear statements of the Fourth Circuit.

The plaintiffs in the case at bar argue that *White* and *Wilson* make some distinction between a "continuing violation" and a "pattern." While the *White* court does not explain any such distinction, it may be inferred that a "continuing violation" is a series of

discriminatory acts of the same kind, for example, repeated instances of the discriminatory failure to promote, while a "pattern" is a series of discriminatory acts of different kinds, for example, discriminatory failure to promote in one instance and disparate pay in another instance. If that is the intended distinction, it is one without a difference. In any event, the Fourth Circuit cases, and *White,* too, for that matter, require some *present* violation, that is, a violation within the limitations period.

In the case at bar, the plaintiffs have presented nothing more than a conclusory allegation of a continuing violation. As stated *supra,* the court finds no alleged discriminatory actions during the 180 days preceding the filing of the charge on November 20, 1980. Under these circumstances, the plaintiffs cannot avail themselves of the continuing violation doctrine with respect to their Title VII claims. In sum, the plaintiffs have not filed a timely *charge of discrimination* under Title VII.

Even if the charge were deemed filed on March 1, 1979, the date the NAACP Labor Committee wrote the Civil Rights Commission, the charge was untimely as to seven plaintiffs. The record shows that at most five plaintiffs sought a referral from the Local within the 180 days preceding that date. Plaintiffs Baltimore, Green, Johnson, Spencer, Travis, and Turner could not identify when they contacted the Local, and there is no evidence otherwise as to them, or at all as to Alfred Folks.

### D.

As noted above, filing a timely charge of discrimination with the EEOC is a requirement that, like a statute of limitations, is subject to waiver, estoppel, and equitable tolling. *Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234, *reh'g denied* 456 U.S. 940, 102 S.Ct. 2001, 72 L.Ed.2d 461 (1982). However, "[p]rocedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants." *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 152, 104 S.Ct. 1723, 1726, 80 L.Ed.2d 196

(1984). "Equitable relief is reserved for only the most deserving complainants." *Polsby v. Chase*, 970 F.2d 1360, 1363 (4th Cir.1992).

In the case at bar, the plaintiffs have suggested no grounds for waiver or estoppel. Furthermore, to the extent that plaintiffs' argument that filing with the OFCCP constitutes filing with the EEOC is an argument for equitable tolling, the court has already rejected that argument.

Therefore, plaintiffs' Title VII claims are barred, and the court will grant summary judgment in favor of the defendants as to those claims. In light of this disposition, the court will not address whether each plaintiff has stated a prima facie case of disparate treatment under Title VII. However, the court will address defendants' laches argument.

## V.

■ Alternatively, the defendants have moved for partial summary judgment to dismiss plaintiffs' Title VII claims on the ground of laches. While "[l]aches is generally a factual question not subject to summary judgment," *Jeffries v. Chicago Transit Auth.*, 770 F.2d 676, 679 (7th Cir.1985), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986), in some circumstances laches may be an appropriate basis for summary judgment. Thus, the court will consider laches at the summary judgment stage of this case.

■ A laches defense requires a showing of inexcusable delay by the plaintiffs resulting in undue prejudice to the defendants. *Holsey v. Armour & Co.*, 743 F.2d 199, 211 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985). As explained below, the court finds that the plaintiffs did not inexcusably delay filing suit, and, therefore, the court will not rely on

laches as a basis for dismissal of plaintiffs' Title VII claims. However, because laches is a factual determination, the defendants would be permitted to prove laches were the court to reach the merits of plaintiffs' case.

The pertinent facts, either undisputed or, if disputed, in the light most favorable to the plaintiffs, are as follows. The charged discrimination allegedly began in January 1979 and has continued since. In March 1979, the NAACP Labor Committee submitted its letter of complaint to the Civil Rights Commission, which promptly forwarded it to the OFCCP. The complaint rested at the OFCCP for 20 months before being advanced to the EEOC, where a charge was filed on November 20, 1980 and perfected on March 11, 1981, as discussed in Parts IV–A and IV–B *supra*. Sometime after the charge was filed, the EEOC undertook its investigation of the matter.[7] On March 26, 1987, after completion of its investigation, the EEOC issued probable cause determinations to the defendants and invited the defendants to participate in settlement discussions. (Pl.Exhs. 51, 55, 103.) In 1988, the International and the Local executed a conciliation agreement proposed by the EEOC (Def.Exh. 26), but the EEOC never executed the agreement. Ultimately, on March 5, 1990, the EEOC issued a right to sue letter for all of the plaintiffs except Spencer (Def.Exh. 29), and the plaintiffs filed suit on April 20, 1990.

The defendants argue first that the plaintiffs inexcusably delayed bringing this lawsuit. In this connection, the defendants assert that the plaintiffs failed to take sufficient action to press their administrative claims to completion. Additionally, the defendants state that the plaintiffs never requested a right to sue letter from the EEOC. The defendants rely upon *EEOC v. Martin Processing, Inc.*, 533 F.Supp. 227 (W.D.Va.1982)

7. The record reveals the following contact between the plaintiffs and the EEOC during the period of investigation. On May 27, 1981, the EEOC sent a Request for Information to each of the ten plaintiffs who signed the charge. (Defendants' Ex. 20.) The cover letter stated that the EEOC officer would call the plaintiffs within 10 days to obtain the information, *id.*, but nothing in the record indicates whether or when the information was collected or received by the EEOC. James Kilby, an officer of the NAACP Labor Committee, called the EEOC on December 9 and 12, 1983, and January 4, 1984. (Defendants' Ex. 21.) There was a telephone call between plaintiff John Flynn and the EEOC on June 1, 1984, and John Flynn called the EEOC on June 15, 1984. *Id.* In January 1985, the EEOC sent Kilby a list of names and requested that Kilby provide the race and address, if known, of each person listed. (Defendants' Ex. 22.) The EEOC called plaintiff Robert Turner on August 28, 1986, and Kilby on September 2, 1986. (Defendants' Ex. 21.)

(Turk, C.J.), in which this court found unreasonable delay by the plaintiff EEOC and applied laches to dismiss a Title VII suit. In addition, the defendants cite Sixth, Seventh, and Eighth Circuit cases for the proposition that a private plaintiff may not simply await completion of the administrative process before filing suit. *See Garrett v. General Motors Corp.*, 844 F.2d 559 (8th Cir.), *cert. denied*, 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 248 (1988); *Cleveland Newspaper Guild v. Plain Dealer Publishing Co.*, 839 F.2d 1147 (6th Cir.), *cert. denied*, 488 U.S. 899, 109 S.Ct. 245, 102 L.Ed.2d 234 (1988); *Jeffries v. Chicago Transit Auth.*, 770 F.2d 676 (7th Cir.1985), *cert. denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986).

Second, the defendants argue that plaintiffs' allegedly inexcusable delay unduly prejudiced the defendants. As to this element, the defendants claim that their key witnesses' memories have dimmed. Union Boiler submits that one of its important witnesses died in 1990. Also, the defendants claim that plaintiffs' memories have dimmed, and, thus, the defendants face difficulty in defending the case. Finally, the defendants maintain that due to the passage of time before suit was filed, their potential monetary liability has increased.

In opposition to defendants' motion, the plaintiffs argue that because laches involves issues of fact, it is generally not subject to summary judgment. Additionally, the plaintiffs contend that laches is not available in a private-party Title VII suit where the delay complained of was caused by the EEOC, not by the plaintiffs. In essence, the plaintiffs argue that they were entitled to await completion of the administrative process. They also maintain that the defendants have not been prejudiced by any delay in the case.

In resolving the laches issue, this court is guided by the Fourth Circuit case of *Holsey v. Armour & Co.*, 743 F.2d 199 (4th Cir.1984), *cert. denied*, 470 U.S. 1028, 105 S.Ct. 1395, 84 L.Ed.2d 784 (1985), in which the court of appeals considered the application of laches to a Title VII claim. There the plaintiff, a private party, filed suit almost five and a half years after filing her charge. However, the Fourth Circuit held that the plaintiff's "deci-

sion to rely on the commission's administrative process before initiating a private suit is not inexcusable delay." 743 F.2d at 211.

Significantly, the Fourth Circuit cited *Bernard v. Gulf Oil Co.*, 596 F.2d 1249, 1256–58 (1979), *adopted*, 619 F.2d 459, 463 (5th Cir. 1980) (en banc), as authority for its holding. In *Bernard*, the Fifth Circuit held that a delay of nine years between charge and suit was not inexcusable, even though "[t]he only justification plaintiffs offer[ed] for this nine-year delay in filing suit [was] their asserted right to await the completion of the administrative review process." 596 F.2d at 1256. The *Bernard* court based its holding on legislative and judicial recognition of a preference for administrative, rather than judicial, resolution of Title VII claims. For instance, in *Occidental Life Insurance Co. v. EEOC*, 432 U.S. 355, 368, 97 S.Ct. 2447, 2455, 53 L.Ed.2d 402 (1977), the Supreme Court recognized "the federal policy requiring employment discrimination claims to be ... whenever possible, administratively resolved before suit is brought in a federal court." *See also Howard v. Roadway Express, Inc.*, 726 F.2d 1529, 1533 (11th Cir.1984) ("[Plaintiff's] failure to file his Title VII claim until completion of the EEOC process was not inexcusable delay and cannot support the application of laches.").

In light of the Fourth Circuit's decision in *Holsey* and the recognized preference for administrative determination of Title VII claims, this court finds with some reluctance that the plaintiffs in this case did not inexcusably delay filing suit. The defense of laches requires a showing that the *plaintiffs* inexcusably delayed the case in some fashion. The delay in the case at bar was occasioned almost solely by the EEOC, not by the plaintiffs. It is true that the plaintiffs could have requested a right to sue letter 180 days after filing their charge, 42 U.S.C. § 2000e–5(f)(1), but they were not required to do so. And, while the plaintiffs could have inquired, or at least inquired more frequently, as to the status of their EEOC cases, they were not required to do so. Although the delay in this case was considerably longer than the delay in *Holsey*, the plaintiffs here were nonethe-

less justified in awaiting administrative determination before proceeding in court.

The cases cited by the defendants do not persuade this court to rule otherwise. While the cases from the Sixth, Seventh, and Eighth Circuits apply the doctrine of laches and, thus, generally support defendants' position, this court is not bound by decisions of other circuits and is not disposed to rely upon them in this instance. Moreover, those cases recognize that "[w]hether laches should be applied ... is a matter within the sound discretion of the trial court." *Garrett v. General Motors Corp.*, 844 F.2d 559, 562 (8th Cir.1988).

Furthermore, *Martin Processing*, 533 F.Supp. 227 (W.D.Va.1982), does not compel this court to find inexcusable delay. In that case, the EEOC filed suit nearly four and a half years after a charge was filed. The EEOC offered no explanation for its delay in proceeding with the case and no evidence from which the court could even infer an excuse for the EEOC's fifty-three month delay. 533 F.Supp. at 229–30. On those facts, the court found the EEOC's delay to be unreasonable. However, *Martin Processing* is readily distinguished from the case at bar. There the EEOC was the plaintiff, so any delay caused by the EEOC was attributable to the plaintiff. In fact, in every case cited by the court for inexcusable delay, the EEOC was the plaintiff. *Id.* at 230–31. In this case, the delay caused by the EEOC is not attributable to the plaintiffs.

In view of the finding that the plaintiffs did not inexcusably delay filing suit in this case, the court will not apply laches to dismiss plaintiffs' Title VII claims.

### VI.

The defendants have also moved for partial summary judgment to dismiss plaintiffs' § 1981 claims as untimely or, alternatively, for failure to state a prima facie case.[8]

### A.

The statute of limitations for § 1981 claims in Virginia is two years.

*McCrary v. Runyon*, 515 F.2d 1082, 1096 (4th Cir.1975), *aff'd*, 427 U.S. 160, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Griffin v. Prince William Hospital Corp.*, 716 F.Supp. 919, 922–23 (E.D.Va.1989). The plaintiffs filed this lawsuit on April 20, 1990. Accordingly, plaintiffs' § 1981 claims will be barred unless the plaintiffs have been discriminated against since April 20, 1988.

As with their Title VII claims, the plaintiffs again seek to avoid the limitations bar on the basis of the continuing violation doctrine. Indeed that doctrine does apply to § 1981 claims. *See, e.g., Bradley v. Carydale Enterprises*, 707 F.Supp. 217, 222 (E.D.Va.1989). However, as explained in Part IV–C *supra*, the continuing violation doctrine only applies where an actual violation has occurred within the limitations period. The mere allegation that a violation continues into the limitations period is not sufficient to avoid the bar.

Seven of the plaintiffs are clearly barred from pursuing § 1981 claims against every defendant. There is no evidence that plaintiffs Baltimore, Boller, Folks, Green, Johnson, McAfee, or Travis had any contact with any defendant after April 20, 1988. Moreover, there is uncontroverted evidence that Boller retired in 1985, Folks died in 1987, and Johnson has not been able to work since 1985. Accordingly, these seven plaintiffs are barred from asserting claims under § 1981.

Because there is some evidence that the remaining five plaintiffs had some contact with the Local after April 20, 1988, the court will consider whether they have made out a prima facie case of discrimination under § 1981. Of course, any claims of discrimination before April 20, 1988 are time-barred.

### B.

In the alternative, the defendants have moved for partial summary judgment to dismiss plaintiffs' § 1981 claims on the ground that the plaintiffs cannot make out a prima facie case of intentional discrimination. With respect to this issue, the court need not and will not address the claims of the seven

---

**8.** Plaintiffs' § 1981 claims against defendant Union Boiler were dismissed by the court on April 14, 1992, upon an endorsed stipulation of dismissal.

plaintiffs who are time-barred, but will only address the claims of the other five plaintiffs: Jerry and John Flynn, Smith, Spencer, and Turner.

■■■■ Section 1981 requires proof of intentional discrimination. *General Bldg. Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 391, 102 S.Ct. 3141, 3150, 73 L.Ed.2d 835 (1982). The Supreme Court has held that the standard for intentional discrimination under § 1981 is the same as that for discriminatory treatment under Title VII. *Patterson v. McLean Credit Union*, 491 U.S. 164, 186–87, 109 S.Ct. 2363, 2377–78, 105 L.Ed.2d 132 (1989); *see Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). First, the plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination. *Patterson*, 491 U.S. at 186, 109 S.Ct. at 2377–78; *Burdine*, 450 U.S. at 252–53, 101 S.Ct. at 1093–94. Second, once the plaintiff proves a prima facie case, the burden shifts to the defendant to produce evidence of legitimate, nondiscriminatory reasons for the challenged action. *Patterson*, 491 U.S. at 187, 109 S.Ct. at 2378; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94. Third, if the defendant meets this burden, the plaintiff must prove by a preponderance of the evidence that defendant's asserted reasons are merely pretextual. *Patterson*, 491 U.S. at 187, 109 S.Ct. at 2378; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94. The ultimate burden of persuasion as to discriminatory intent remains at all times with the plaintiff. *Patterson*, 491 U.S. at 187, 109 S.Ct. at 2378; *Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093–94.

■■■■ In the case at bar, defendants' motions for summary judgment involve only the first stage of proof; the defendants argue that the plaintiffs have failed to state a prima facie case of discrimination. "[W]here the nonmovant is unable to establish at least the minimal elements of the prima facie case under the *McDonnell Douglas* methodology, the entry of summary judgment is required." *Randle v. LaSalle Telecommunications, Inc.*, 876 F.2d 563, 568 (7th Cir.1989) (citing *Celo-*

*tex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Indeed "[i]t is axiomatic that there can be no genuine issues of material fact if the plaintiff is unable to establish a prima facie case 'since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.' " *Randle*, 876 F.2d at 568 (quoting *Celotex Corp.*, 477 U.S. at 323, 106 S.Ct. at 2552).

Seeking to avoid strict application of the *McDonnell Douglas* test, the plaintiffs assert that they are proceeding on a "pattern and practice" theory of discrimination. The plaintiffs concede that to prevail on their claims at trial, they must prove by a preponderance of the evidence, with respect to each plaintiff, each of the elements of a prima facie case as set forth in *McDonnell Douglas.* The plaintiffs also concede that to defeat defendants' motions for summary judgment, they must raise material issues of fact as to those elements. Nevertheless, the plaintiffs claim that under a "pattern and practice" theory, a prima facie case may be established simply by the identification of a hiring practice or policy and proof that the practice or policy was racially motivated.

■■■■ Plaintiffs' argument is unavailing. The court agrees with the defendants that the plaintiffs in this private, non-class action cannot avail themselves of "pattern or practice" rules of proof. As noted by the defendants, that theory is available only to the government or to private plaintiffs in a class action. For instance, under Title VII, the EEOC is authorized to file suit "[w]henever [it] has reasonable cause to believe that any person or group of persons is engaged in a *pattern or practice* of resistance to the full enjoyment of any of the rights secured by [Title VII], and that the *pattern or practice* is of such a nature and is intended to deny the full exercise of th[ose] rights." 42 U.S.C. §§ 2000e–6(a), (c). *See International Bhd. of Teamsters v. United States*, 431 U.S. 324, 357–62, 97 S.Ct. 1843, 1865–68, 52 L.Ed.2d 396 (1977). In addition, courts have allowed the use of "pattern or practice" rules in class actions brought by private plaintiffs. *See Franks v. Bowman Transp. Co.*, 424 U.S.

747, 751, 772, 96 S.Ct. 1251, 1268, 47 L.Ed.2d 444 (1976).

However, neither Congress nor the courts have allowed individual private plaintiffs to avoid application of the *McDonnell Douglas* criteria by invocation of a "pattern or practice" theory. Only one circuit court has even considered the issue. *See Scarlett v. Seaboard Coast Line R.R.*, 676 F.2d 1043, 1053 (5th Cir. Unit B 1982). In *Scarlett*, after a bench trial, the district court dismissed three plaintiffs' Title VII and § 1981 claims for failure to make out a prima facie case of discrimination. On appeal, the former Fifth Circuit rejected those plaintiffs' attempts to rely on a "pattern or practice" theory:

> [Plaintiffs] have attempted to convince us that their suit is a "pattern and practice claim," in which proof of a pattern of unlawful discrimination is established at the first, or liability, phase of trial and issues of individual entitlement to relief are reserved for the second stage. That label is inaccurate as applied to this case and cannot alter the fact that plaintiffs Bell, Odol, and Lindsey must prove their claim that they were discriminatorily refused positions as trainmen. This is not a "pattern and practice" suit by the government under section 707, 42 U.S.C. § 2000e–6, in which the government may postpone until the "remedial" stage of trial proof that each individual for whom it seeks relief was discriminatorily denied an employment opportunity. *See International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 361–62, 97 S.Ct. 1843, 1867–68, 52 L.Ed.2d 396 (1977). Nor is this a private class action, in which a similar manner of proceeding with the production of evidence is appropriate. *See Franks v. Bowman Transportation Co.*, 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444 (1976). An individual proceeding as an individual under Title VII must prove the elements of a discriminatory hiring claim as set forth in *McDonnell Douglas.* This the [plaintiffs] failed to do.

676 F.2d at 1053 (footnote omitted).

■ In light of *Scarlett*, and in the absence of any contrary authority, this court concludes that each plaintiff must establish a prima facie case under *McDonnell Douglas* in order to avoid adverse summary judgment. Under the *McDonnell Douglas* standard, each plaintiff in this case may establish a prima facie case against the Local[9] by showing that (i) he belongs to a racial minority; (ii) he was qualified and requested referral to a job to which the Local was referring applicants; (iii) despite his qualifications, he was not referred; and (iv) after his nonreferral, the Local continued to refer applicants with plaintiff's qualifications to available jobs. *See McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824; *Mills v. International Bhd. of Teamsters,* 634 F.2d 282, 285 (5th Cir. Unit B Jan. 1981).

■ At a minimum, each plaintiff must raise a genuine issue of material fact as to each of the elements of the *McDonnell Douglas* test. However, the plaintiffs are not required at this stage to identify each job that each plaintiff would have obtained but for the discriminatory referral system operated by George Cline and the Local. For example, proof that there was a job available, without identification of which job, may be sufficient to satisfy part of the second or fourth elements of the *McDonnell Douglas* standard as set forth above.

Turning to the record of the case, the court finds no dispute over the fact that each of the five plaintiffs whose § 1981 claims are not time-barred—Jerry and John Flynn, Smith, Spencer, and Turner—is black and was qualified for referral. Beyond that, however, the evidence involving these five plaintiffs after April 20, 1988, the commencement of the § 1981 limitations period, is not so clear. In pursuing a "pattern or practice" theory of discrimination, the plaintiffs have neglected to allege sufficient facts to establish a prima facie case of intentional discrimination as to each plaintiff. Furthermore, upon its own examination of the record, the court fails to find sufficient such evidence.

■ The plaintiffs maintain that George Cline continued to operate the Local under

---

9. Because plaintiffs' claims against the International and Riggs are wholly derivative of their claims against the Local, the court will first analyze plaintiffs' claims against the Local.

his own standardless system of referrals at least through the fall of 1988. Moreover, the plaintiffs claim that Cline had no written system of any kind, and he never followed any particular system, such as seniority or first-on-the-list, for referring laborers to jobs. In addition, the plaintiffs claim that Cline did not take applications, had no requirement that laborers seeking work notify him of that fact by any particular means, and did not require that they appear at the Local hiring hall. While Cline admitted that he operated in such a manner in 1977 and even as late as 1984, there is no evidence that Cline operated in such a manner at any time after April 20, 1988. In any event, the fact that Cline operated without objective standards, without more, does not amount to a prima facie case of intentional discrimination.

■ In October 1988, the Local adopted the referral and hiring procedure set forth in the proposed EEOC conciliation agreement.[10] (Pl.Exh. 98.) That procedure requires the Local to register all applicants for employment, maintain a list of the applicants in the order of registration, and, in general, refer each applicant to an employer in the order of the applicant's place on the registration list. An applicant who is not a union member must pay an $8 fee at the time of registration. A registrant must re-register at least every four weeks to maintain his place on the list. The Local is to be open every Monday from 5:00 p.m. until 7:00 p.m. for applicants to register. If a registrant is referred to a job and works on that job for more than five days, his name is removed from the registration list; he may re-register at the bottom of the list upon termination of the job. If a registrant refuses to accept a referral, he is dropped to the bottom of the registration list. The Local has no obligation to locate any registrant who cannot be located by telephone within two hours. Finally, the conciliation agreement contains reporting provisions whereby the Local agrees to maintain certain records of the operation of the referral and hiring procedure.

There is no evidence that after the registration list was implemented Cline referred any laborer who had not signed the registration list to any job. While the Local adopted the referral and hiring procedure, Cline did not follow the procedure in every respect. For example, Cline admitted that he did not keep all the specified records. Moreover, the hiring hall was not open for registration every Monday. However, the fact that Cline did not follow procedure in every detail does not by itself give rise to an inference of intentional discrimination. Because the agreement was neither executed by the plaintiffs nor approved by the EEOC, Cline was not required to adopt the conciliation agreement's procedure in any respect.

■ On March 20, 1989, Jerry and John Flynn went to the hiring hall, filled out applications, paid their $8, and signed the registration list. (Pl.Exh. 16, Jerry Flynn dep. 2/22/91 at 105; Pl.Exh. 105, Jerry Flynn application.) On April 26, 1989, the Flynns were referred to a job at Dulles Airport, but they declined that referral. (Pl.Exh. 16, Jerry Flynn dep. 2/22/91 at 109.) Later in 1989, Jerry Flynn was referred to a job for Riggs at the Avtex plant, although he was fired after one week on the job.

The plaintiffs claim that a white laborer, Dale Potter, applied at the Local hiring hall after Jerry and John Flynn, but was referred to a job before the Flynns. However, the only evidence offered by the plaintiffs are the applications of Potter and Jerry Flynn. (Pl. Exh. 105.) Jerry Flynn's application is dated "3–20–89," and Potter's is dated either "1/23/89" or "3/23/89." Inasmuch as the plaintiffs admit that Potter signed the list twice, as numbers 52 and 75, before Jerry and John Flynn signed the list for the first time as numbers 84 and 85, respectively, the only reasonable inference is that Potter first applied in January 1989. Given their places on the list, it would have been appropriate for Potter to be referred ahead of the Flynns, although there is no record evidence to that effect. And, even if Potter applied after the Flynns, there is no record evidence

10. The Local and the International signed the EEOC conciliation agreement on October 20, 1988, but, as far as the record shows, neither the EEOC nor any of the plaintiffs executed the agreement.

that he was referred to a job before the Flynns were offered jobs at Dulles.

Additionally, Jerry Flynn claims that the white high school athletes with whom he grew up, such as Chucky Ruffner and Cowboy Henry, "always had work." (Pl.Exh. 16, Jerry Flynn dep. 2/22/91 at 147, 162, 166–72.) This bare testimony, without evidence of where or when the white laborers worked, how they obtained their jobs, and so forth, is insufficient to establish a prima facie violation of § 1981. In short, neither Jerry nor John Flynn has made out a prima facie case of intentional discrimination under § 1981.

■ Jerome Smith went to the hiring hall more than five times in the fall of 1989 [11]—on Mondays around 5:30 p.m.—but Cline was not there. (Pl.Exh. 11, Smith dep. 2/1/91 at 90–91.) When Smith eventually reached Cline at home by telephone (*id.* at 92.), Cline told Smith that he needed to sign the registration list and pay the $8 application fee. (*Id.* at 93.) Smith testified that he signed the registration list on April 27, 1989, and was referred by Cline three days later to a job for Conco at the Avtex site. (*Id.* at 102.)

Smith also testified that two white laborers, David Shepard and James Smith, signed the registration list after him, but were referred to jobs before him in April 1989. (*Id.* at 121–22.) Shepard was referred to a job for Riggs, and James Smith was referred to a job for Conco. (*Id.* at 122–23.) However, Jerome Smith stated that he has not seen the registration list since he signed it in April 1989, he does not know his own number or the others' numbers on the list, and he does not recall the dates the others went to work or how long before him they went to work. In light of the clear testimony that Smith in fact received referrals from Cline, Smith's naked testimony as to Shepard and James Smith, which is not otherwise supported by the record, is insufficient to establish a prima facie case of discrimination.

Jerome Smith also wrote Cline letters in 1989 and 1990, when he was unable to contact him at the hiring hall or by telephone.

In 1990, shortly after sending one of these letters, Smith was referred by Cline to a job for George Hyman Construction near Leesburg, Virginia. (*Id.* at 110.) Again, Smith has failed to state a prima facie claim.

■ As to John Spencer, there is scant evidence as to any events within the § 1981 limitations period. He went to the Local hiring hall with John Flynn and Smith sometime in 1988. (Pl.Exh. 1B, John Flynn dep. 1/29/91 at 146.) There is no evidence that this visit occurred after April 20, 1988, but even if the visit was within the limitations period, there is no evidence as to whether Spencer applied for employment or as to what transpired at the hiring hall. In short, Spencer has failed to state a prima facie case of intentional discrimination under § 1981.

■ Robert Turner signed the registration list in November 1988 as number 13. (Pl.Exh. 10A, Turner dep. 3/25/91 at 191; Pl.Exh. 104, registration list.) Cline had called Turner to ask him to come to the hiring hall and sign the list. (Pl.Exh. 10A, Turner dep. 3/25/91 at 178.) Soon after Turner signed the list, Cline called Turner to refer Turner to a job for Riggs at the Avtex plant. Turner worked at Riggs in both 1988 and 1989. (*Id.* at 95–96.)

As far as the record shows, Turner did not sign, or attempt to sign, the registration list at any time other than November 1988, nor did he otherwise request a referral during the period after April 20, 1988. On the foregoing facts, Turner has not made out a prima facie case of intentional discrimination under § 1981.

In addition to the foregoing, it should be noted that the portion of the registration list in the record indicates that four black laborers, including plaintiff Turner, signed the list as numbers 13, 14, 15, and 17 and received referrals to jobs at Avtex. Moreover, the registration list shows that two white laborers were referred to jobs at Dulles.

In sum, none of the five plaintiffs under consideration has stated a prima facie case of intentional discrimination under § 1981. Ac-

---

11. Smith states that it was in the fall of 1989, but that is inconsistent with his other testimony. It probably was the fall of 1988.

cordingly, the court will grant summary judgment in favor of the defendants as to these five plaintiffs' § 1981 claims.

## VII.

In light of the court's findings and conclusions, the court deems it unnecessary to consider whether the International, Riggs, or Union Boiler may be held liable on an agency theory.

Finally, in light of the court's grant of summary judgment in favor of the defendants, the court will deny plaintiffs' motions for leave to file first and second amended complaints.

## VIII.

For the reasons stated herein, the court will grant summary judgment in favor all defendants as to all plaintiffs' claims on the following grounds:

(1) the NAACP Labor Committee lacks standing;

(2) plaintiffs' Title VII claims are barred because the plaintiffs failed to file a timely charge of discrimination with the EEOC;

(3) the § 1981 claims of plaintiffs Baltimore, Boller, Folks, Green, Johnson, McAfee, or Travis are barred by the statute of limitations;

(4) plaintiffs Jerry and John Flynn, Smith, Spencer, and Turner have failed to state a prima facie case of intentional discrimination under § 1981.